### WARNER v. PACKER et al.

(Supreme Court, Appellate Division, Second Department. June 17, 1910.)

**1.** PHYSICIANS AND SURGEONS (§ 14*)—LUNACY EXAMINATION—CARE REQUIRED.

Where alienists were feed by plaintiff's husband to make an examination of her sanity, they impliedly represented that they possessed the reasonable degree of learning and skill ordinarily possessed by average examiners in lunacy, and in making such examination undertook to use such skill and learning and to exercise their best judgment in the application thereof and to use reasonable care.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 21; Dec. Dig. § 14.*]

**2.** PHYSICIANS AND SURGEONS (§ 18*)—ALIENISTS—EXAMINATION—BURDEN OF PROOF.

In an action against alienists for alleged malpractice in a lunacy examination of plaintiff, the burden was on plaintiff to show that defendants fell short in their qualifications or obligations.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 39; Dec. Dig. § 18.*]

**3.** PHYSICIANS AND SURGEONS (§ 18*)—MALPRACTICE—LEARNING AND SKILL—EVIDENCE.

In an action against alienists for malpractice, evidence that they were educated in their profession, that they had filled important public positions as alienists, and were of large experience gained from thousands of examinations, was sufficient to establish that they possessed the reasonable learning and skill ordinarily possessed by average examiners in lunacy.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 40; Dec. Dig. § 18.*]

**4.** EVIDENCE (§ 478*)—INSANITY—NONEXPERTS—OPINION.

In an action against alienists for alleged malpractice in issuing a certificate that plaintiff was insane, pursuant to which she was confined for a time in an asylum, evidence of lay witnesses who were plaintiff's acquaintances and friends that in their opinions specified words and acts of plaintiff were rational was competent to show that at the time of such examination she was sane.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2242; Dec. Dig. § 478.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. PHYSICIANS AND SURGEONS (§ 15*)—MALPRACTICE—ERROR OF JUDGMENT.

Alienists could not be made liable for malpractice in issuing a certificate of insanity against plaintiff where they were guilty of nothing more than an error of judgment.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 32; Dec. Dig. § 15.*]

6. APPEAL AND ERROR (§ 1002*)—VERDICT—CONFLICTING EVIDENCE—REVIEW·

In determining whether the evidence was sufficient to sustain a verdict for plaintiff, the appellate court is bound to reject so much of defendant's evidence as conflicts with that introduced by plaintiff.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3935; Dec. Dig. § 1002.*]

7. PHYSICIANS AND SURGEONS (§ 18*)—MALPRACTICE—ALIENISTS—EVIDENCE.

In an action against alienists for alleged malpractice in examining plaintiff as to her sanity, evidence *held* insufficient to sustain a verdict finding that defendants were negligent in making such examination and did not exercise their best judgment, skill, and learning in arriving at a conclusion that plaintiff was insane.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 43; Dec. Dig. § 18.*]

Appeal from Trial Term, Rockland County.

Action by Ellen E. Warner against Flavius Packer and another. From a judgment for plaintiff and from an order denying defendants' motion for new trial, they appeal. ·Reversed, and new trial granted.

Argued before JENKS, BURR, THOMAS, RICH, and CARR, JJ.

James Taylor Lewis, for appellants.

Stillman F. Kneeland, for respondent.

JENKS, J. The action is for negligence. The plaintiff had been confined for a time in an insane asylum upon her husband's petition, to which was annexed a certificate of the defendants as examiners in lunacy that she was insane and was a proper subject for custody and treatment in some institution for the insane as an insane person. She complains that the defendants made a false, pretended, and grossly negligent examination of her as to her mental condition, that she was not insane then or at any time, that the defendants willfully failed and neglected to use or to exercise reasonable and ordinary care, skill, and diligence to ascertain her true mental condition, or to make a prudent and careful inquiry and proof whether she was sane or insane, and failed to exercise their best judgment as to her sanity, but with gross and culpable negligence based their opinions upon false and pretended statements made to them by plaintiff's husband. ·She gained a verdict for $25,000, and the defendants appeal from the judgment thereon.

The defendants were feed by the husband to make an examination. Thereupon they impliedly represented that they possessed the reasonable degree of learning and skill ordinarily possessed by the average examiners in lunacy, and in the rendition of the services they undertook to use such skill and learning, to exert their best judgment in the application thereof, and to exercise reasonable care. Pike v. Honsinger, 155 N. Y. 201–210, 49 N. E. 760, 63 Am. St. Rep. 655, and cases cited. The burden was upon the plaintiff to show that the de-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

fendants fell short in their qualifications or their obligations. Winner v. Lathrop, 67 Hun, 511, 22 N. Y. Supp. 516; Georgia Northern Railway Co. v. Ingram, 114 Ga. 639, 40 S. E. 708. There is no proof that the statements made by the husband were false and pretended. The plaintiff did not advance the proposition that the defendants were not qualified. On the other hand, the evidence shows that they were educated in their profession, alienists who as such had filled important public positions, and were of large experience gained from thousands of examinations. We therefore need not consider this ground of liability. The question on this appeal is whether the plaintiff made proof to justify the verdict of negligence in (to quote the plaintiff's charge) "the ascertainment of plaintiff's true mental condition." The plaintiff's case consists largely of testimony of lay witnesses, her acquaintances and friends, that in their opinions specified words and acts of the plaintiff were rational. The plaintiff contended that at all times she was sane. Such contention, so far as it related to the time of her examination, was essential, inasmuch as she could not have been harmed by a certificate of the truth (Pennell v. Cummings, 75 Me. 163) unless her insanity did not require restraint and treatment. A certificate of her insanity when she was sane could establish error of judgment, but for that the defendants were not liable (Williams v. Le Bar, 141 Pa. 149, 21 Atl. 525; Pike v. Honsinger, supra); and it could be considered as evidence bearing upon the defendants' qualifications or indicating failure to fulfill their obligations as to skill, learning, care, and best judgment in the case. But no presumption of negligence in the defendants arose solely upon the establishment of her sanity at the time of her examination by the defendants. Williams v. Le Bar, supra.

The defendants testified in detail as to their professional conduct. The testimony of the plaintiff was contradictory, but not contrary to that of the defendants. She testified that an examination was made, but her version varies radically from the versions of the defendants, and upon rebuttal she contradicted certain features thereof described by the defendants. Her contradictions were directed to many of her statements testified to by the defendants which to the lay mind would indicate her abnormal mental condition. As the question of veracity was for the jury, the plaintiff, when we consider the correctness of the verdict, is entitled to have her version accepted by us rather than that of the defendants. She testified upon her direct examination that the defendants were introduced to her as nerve specialists, of whom one asked her a few questions and the other did not speak; that they were with her about 15 minutes; that they asked her one or two questions about her general health, and drew from her some facts in relation to her recent experiences with her husband; that they took no notes; that they asked her whether she had ever thought of ending her life, recurring to that question two or three times; and that there was something said about readers which she was making. The reference to the readers is explained by the fact that the plaintiff was the author of several text-books used in schools.

The version of the defendants, *revised by exclusion of the parts thereof contradicted by the plaintiff on rebuttal,* is as follows: The

plaintiff was lying in a sort of lounge chair or steamer chair, covered with blankets. She seemed anxious. She was very pale in appearance when they went in, and then her face flushed, her whole manner changed, and she showed intense anger and excitement. After the husband left the room the defendants gave their names, and said that her husband had asked them to make an examination, which they would be glad to do if she were willing, but that they did not wish to distress her, whereupon she said it was one of her husband's schemes to annoy her and he would ultimately drive her insane. When asked about her health, she said it was not very good, that there was sufficient cause—her husband, who forced her to work out of doors, and that she had to haul stones. She then rose and showed the paths she had made outside. She said her husband had deliberately walked across the lawn to annoy her. Dr. Packer asked her again about injuring herself, and she said she would not, that she would not bring disgrace on her family. The husband returned, and she acted very angry towards him. She said she had to move her bed because of a leak in the roof. She became very much excited at four separate times during the examination. She would pale and flush and her pupils would dilate and her muscles would contract and she would sit up. Finally she rose hastily from her chair, started across the room and said, "I will show you about my work." She spoke of her works, and she arose very hastily from the chair and went across the room quickly to a little desk she had there, and said she would show them these readers, but she did not have the readers, but had some descriptive pamphlets in regard to the readers, and they read those; and she had some printed papers in regard to the readers, but she did not have the readers, it was some printed description of the readers, and she said she was the "Savior of the English speaking races," and she spoke of the book, and said it was the finest that had been written, and during that time she talked very quietly about it, and she said she would send them copies of the books. Then she returned to the chair and she spoke of her work and her accomplishments, and showed them a statement a number of different times. In regard to her physical condition, of course, Mrs. Warner looked fairly well, excepting that she was pale and very anxious, and she looked to be all right excepting during the period of excitement; then she would become excited and speak in a very loud voice. She became excited to the extent that she spoke and shouted in a very loud voice, and she showed great excitement during this time, and then again she would become more composed. As regards her physical condition, it was very fair. They did not make a record of her pulse, but Dr. Packer took her pulse and it was somewhat accelerated. She was anæmic when Dr. Packer looked at her, and he thought so, at first, but in looking at her again he found her color was very good; that her pupillary reflexes were all right, and the various reflexes were all right. Dr. Wilgus testified that after he and Dr. Packer came to the plaintiff her husband said: "Nellie, I have brought these two physicians to examine you, because I thought you were sick. They will talk with you, and will see if anything can be done for your good." Mrs. Warner seemed out of patience. She appeared angry and made the

remark to Mr. Warner, but made no other objection to their remaining there. Mr. Warner stepped downstairs and left them alone with his wife. Dr. Wilgus permitted Dr. Packer to do most of the questioning, nevertheless following what was said very closely. Mrs. Warner was asked how she felt ill, and asked to discuss the matter in general. Mrs. Warner said that she had been feeling badly, had been nervous for some time, that she had a great many troubles at home, and that she was very much worried; that Mr. Warner had been making trouble for her for a number of years, and that he was gradually getting worse; that in her opinion, he was anxious to obtain control of her property, and was taking steps to drive her to commit some act which would permit of his obtaining the property should that result; that it was part of the scheme for him to control her property; that these troubles had come on her within the past few years; that he had been annoying her in all sorts of ways, for instance, that on one occasion he entered her room, after having been working out of doors, and removed a shirt in which he had been working out of doors and threw it on a chair on which one of her dresses was placed; she thought he did this with some malign intention to exasperate her; this had occurred a year or two before, if the witness remembered rightly, and yet she brought that up as one of his supreme insults, as she called them. (The plaintiff on rebuttal did not deny absolutely this testimony as to the shirt. She said that she did not think she spoke of it.) She said they had moved to Dellview after he purchased that property, for the purpose of benefiting her health; that she was very much run down, and that she was unable to control herself a great part of the time; that her husband was trying to drive her to some extreme act by leaving leaky roofs over her head, and by meddling with her clothes and giving her insufficient clothing to wear, and all sorts of things of that kind. The witness thinks that she mentioned that her husband squandered her money. She said something about their buying Dellview with the intention of putting up a house there, and that they had erected the foundations, which were observable, but right after the foundations were erected that he had contented himself with putting up some chicken coops and making her live in the barn, which was an unfinished building. During the examination Mrs. Warner did speak of her husband squandering her money. When Mr. Warner returned to the room with a pail of water, Mrs. Warner stopped conversing with them when he entered the house, and when she heard his step on the stairs. He came up the stairs, and put the water on a small stand at the head of the stairs. She looked at him in a very angry way and stared him out of countenance, and he went downstairs without a word. After he was gone, Mrs. Warner said that at times she was unable to control herself owing to her nervous and run-down condition, and as she talked with them over these family difficulties, she became wrought up. She had little or no control of her emotions. The defendants testified without contradiction that they were strangers to the plaintiff and to her husband until the latter came to retain them, with a letter of introduction to Dr. Packer. Dr. Packer testifies that the plaintiff's husband laid before him in a worried and rather impressive way the conduct and the doings of the plaintiff as follows:

"Mr. Warner said he feared he would have to send Mrs. Warner to a sanitarium; that for three or four years she had been acting strangely, and that for two or three years they had a great deal of trouble; that there was nothing he could do to please her, that she attacked him, had threatened him, and has also threatened to injure herself, and he said he did not want to do it. He said she was sick, that the city life disagreed with her, and they finally purchased a place in the country. He said she was nervous and ill, and he took her to the country, and that they bought this country home hoping that she would recuperate. He said she worked out of doors in the hot sun, carrying these stones and trundling a barrow and exposed herself, and it injured her health, and that he could not control her in this, and he said when he went home at night that she would attack him, and that she left notes around the house for him instead of speaking to him, and that those notes were in the form of agreements which he had to sign, and which were utterly ridiculous, but he had to sign them—he said that he had to sign those, and he said that they had so much trouble over the expense of the house and the expense of the two, that it was agreed they would divide all the expenses, and that it was extremely humiliating to him, because he had to divide the car fare even, and he spoke of those things as showing her state of mind, and he wanted to know what I thought. He asked me for an opinion. * * * He also said that she would scream and scream until it had disturbed the neighbors, and they had finally had to let their house, or their rooms, or whatever it was. He gave me the facts which are asked for on the fourth page of the certificate, after the article requiring her age, condition, and so forth, which is just prior to the affidavit. * * * I did not know Mr. Warner before this day. I next saw Mr. Warner a few days after that —four or five days after; then he came the second time in regard to the case. I did have a further conversation with him with reference to his wife's case. I had a further conversation with him, and got those facts on the fourth page of the certificate at the time of the first visit; it was at the time of the second visit. At the time of the second visit he said he had decided; at the time of the second visit he asked me to examine Mrs. Warner, and we went over many of the facts as enumerated above. After this conversation I proceeded to New City."

Dr. Wilgus testified:

"I did have a conversation with Mr. Warner in reference to his wife's case on the occasion of this trip to New City, on July 13, 1904. Mr. Warner said that he told me on the train that he and Mrs. Warner had known each other for a number of years, and that they had been married, for I think, about 10 years—I will say that roughly, I don't remember the exact length of time; that they had lived a very happy life, and were apparently congenial until about 1900. Mr. Warner said that they had gotten along very well until about 1900, and between 1900 and this time in 1904 Mrs. Warner had threatened to commit suicide; that she had assaulted him; that she had made him sign very unusual agreements, including much that he considered nonsensical; that she had made him agree to share half the expenses of the house account with her; that she accused him of being a thief, and of having designs on her property and even on her life; that in order to benefit her health they had agreed to purchase that place at Dellview, and that she had gone out there in the attempt to recuperate; that things had progressed no better from the time that she had gone to Dellview, and in fact that his wife had become even more exacting, and that he felt that for her good, something ought to be done for her welfare."

Some of the statements of the husband as testified to by Dr. Wilgus are corroborated by the writings of the plaintiff read in evidence.

A striking feature in the plaintiff's case is the omission of any scientific or expert evidence as to the course pursued by the defendants in the examination, as to what was done that the average examiner in lunacy would not have done, or as to what was not done which such an examiner would have done under the circumstances of the

case. We know insanity is a mysterious disease, that it may exist without physical indications, is often cunningly concealed so as almost or altogether to baffle detection even by a specialist, or may be so occult as to cause most eminent alienists to clash as to its existence in an instance. The diagnosis of it is recognized as a difficult task. Balfour Brown, The Medical Jurisprudence of Insanity, p. 320; Mann's Medical Jurisprudence, p. 113. Wharton & Stille on Medical Jurisprudence write in section 1240:

"In brief, the task of a physician when he examines a patient for certification is to make a diagnosis. If, for any reason, he is not able to make a diagnosis, he should not sign the certificate. The whole art of diagnosis may be involved in the case, and there is no rule for it except to have a reliable knowledge of insanity."

It seems to me that the very nature of the subject—the question of negligence in a diagnosis—would almost preclude a jury from passing upon it by their common knowledge unaided by any scientific or expert information whatever, or by the testimony of any witnesses of special knowledge and skill. Yet there is not in evidence any standard for comparison of the conduct of the defendants with that which was required of them. In Van Wycklen v. City of Brooklyn, 118 N. Y. at page 429, 24 N. E. at page 180, the court, per Brown, J., say:

"While it is no longer a valid objection to the expression of an opinion by a witness, that it is upon the precise question which the jury are to determine (Transportation Line v. Hope, 95 U. S. 297 [24 L. Ed. 477]; Bellinger v. N. Y. C. R. R. Co., 23 N. Y. 42; Cornish v. F. B. F. Ins. Co., 74 N. Y. 296), evidence of that character is only allowed when, from the nature of the case, the facts cannot be stated or described to the jury in such a manner as to enable them to form an accurate judgment thereon, and no better evidence than such opinions is attainable. (Ferguson v. Hubbell, 97 N. Y. 507 [49 Am. Rep. 544]; Schwander v. Birge, 46 Hun, 66; Greenl. on Ev. vol. 1, § 440, and note.) Familiar examples of the admission of evidence of this character are cases involving questions of medical practice and skill, and cases involving genuineness of handwriting."

See, too, Dougherty v. Milliken, 163 N. Y. at page 533, 57 N. E. 757, 79 Am. St. Rep. 608; Northern Pacific Railroad v. Urlin, 158 U. S. at page 273, 15 Sup. Ct. 840, 39 L. Ed. 977; Rogers on Expert Testimony, p. 148; Thompson on Negligence, § 8848 et seq.; Link v. Sheldon, 136 N. Y. 1–10, 32 N. E. 696; Connecticut Mut. Life Ins. Co. v. Lathrop, 111 U. S. 612, 4 Sup. Ct. 533, 28 L. Ed. 536. In Wood v. Wyeth, 106 App. Div. 21, 94 N. Y. Supp. 360, this court, per Bartlett, J., indicated the importance of such testimony as is lacking in this case, and said:

. "I have been unable to find enough in the proof offered by the plaintiff to justify a finding that there was any lack of professional intelligence, skill, or care on the part of the respondent, either in deciding to perform the operation, or in its performance, including the administration of the chloroform. The plaintiff sought to establish such negligence by the testimony of a medical expert, Dr. Harry Enton of Brooklyn; but neither in answer to hypothetical questions, nor in any other part of his testimony, does he really express the opinion that what is shown to have been done by Dr. Wyeth was contrary to the best or established practice of qualified surgeons in the treatment of such a case under similar circumstances."

Nor do I think that any negligence can be imputed in this case to the omission to make further inquiries, although it is recognized in a

leading English case (Hall v. Semple, 1 F. & F., 337) that such obligation may exist. The husband's narrative was of the relations between him and his wife—this plaintiff—of her conduct and her bearing towards him. Husband and wife appeared as living under the same roof, and there is no indication that there was any one whom the defendants could have consulted in corroboration of the husband, save, of course, the wife. Upon consideration of the case in the light most favorable to the plaintiff, as is her due, I fail to find sufficient evidence to support the verdict. As I have said, I have not considered the full versions of the defendants of their examination. And I have not considered the testimony of two eminent physicians, specialists in insanity, called by the defendants (whose testimony upholds the defendants), for the reason that the hypothetical questions addressed to those witnesses embodied features which, though testified to by the defendants, were contradicted by the plaintiff. I should notice one bit of testimony of the defendants, which, though contradicted by the testimony of the plaintiff, nevertheless has the corroboration of probability, found in her writings. Dr. Packer testified that in the course of her examination the plaintiff spoke about a brook near her house, "that the brook babbled on, that it did not see the loveliness of the trees and rocks and that it would drown her as quickly as it would a rat, and that the name of this brook was Elmer Warner" (her husband). Dr. Wilgus testified that the patient said that she had become so nervous that she thought of suicide, and "had even gone to the brook, with the deliberate intention of doing away with her life, but when she heard the rippling of the water over the stones, it brought up a soothing turn of thought which restrained her from committing the act * * * as she looked at the little brook that ran over the ground, and as it undermined the shrubbery and trees on the banks, and yet rolled on pleasantly, that it reminded her of the acts of Elmer Warner, who would like to drown out her life as the brook would." The plaintiff in rebuttal testified: "The brook was not mentioned." This examination took place on July 13, 1904. Defendants' Exhibit D, written by the plaintiff, is as follows:

"July 13, 1904. I got another interpretation of the Brook yesterday when I went to it for solace and rest. I fear it will never sooth me again as it has done. I found myself saying to it, 'You are insensate, following your own bent, your own idle pleasure, your own aims regardless of what good or ill you do. You have no feeling for the arched beauty of rock and forest that bends protectingly above you. You would undermine it and find your way through its ruins or about them and laugh on as unconcernedly as ever. You would drown out the wonderful life of a human being in any of your pools as willingly as you would a rat, and then ripple on, whispering with your fairy voices as if you had sweet secrets to tell. You are the highest of all types of smiling, wooing ruthlessness. Your name is Ellsworth Warner.' Dear Auntie: This is sent you though not written for you on the eve of my departure, in a close carriage, for parts unknown. Yours affectionately, Nellie."

There is ground for surmise that the jury found negligence from the premise that the plaintiff was sane at the time the defendants certified that she was insane, for the minutes show that they "returned their verdict in which they find that Mrs. Warner was, on the 13th day of July, sane and rational and find doctors guilty of negligence and fix the damages at $25,000." The finding of sanity was no more a

part of their formal verdict than would be a finding in a verdict for the plaintiff in a negligence case that the plaintiff was not chargeable with contributory negligence.

I advise that the judgment and order be reversed, and that a new trial be granted; costs to abide the event. All concur.