EDWARD J. CALLAHAN et al., as Committee of the Person and Estate of KATHERINE E. CALLAHAN, an Incompetent Person, Claimants, *v.* STATE OF NEW YORK, Defendant.

(Claim No. 27204.)

Court of Claims, February 27, 1943.

*Patrick J. Keniry* for claimants.

*John J. Bennett, Jr., Attorney-General (Paul Muscarella* of counsel), for defendant.

Fitzsimmons, J. Claimants herein seek $100,000 damages for injuries sustained by their incompetent ward, Katherine E. Callahan, then, as now, confined in Utica State Hospital, an institution maintained and operated by the State for the care of insane patients.

The ground of the claimants' demand is that the State was negligent in permitting their ward — for the second time — to escape from the hospital and attempt suicide, through which she sustained numerous, severe, painful and permanent injuries.

Preceded by several intermediate, and severe, painful operations, the injured patient's legs were amputated at the knees. Subsequently, several protracted and painful trips to Albany were required for the purpose of fitting artificial legs, with concurrent treatment at Albany Hospital.

Both escapes were effected in a similar manner from the open grounds of the hospital. From such grounds to neighboring public streets there were four unguarded gates through which Miss Callahan observed other patients walking and, in addition, there were numerous wide breaks in the fence encircling the grounds, affording convenient and ample exits.

The first escape was made September 24, 1941, and the second November 8, 1941, at both of which times the injured patient, in hospital terminology, "* * * was enjoying the privileges of ' open ward,' " which then included use of the hospital grounds. The hospital grounds were available for such use "* * * when in the opinion of the medical staff it is proper to do so."

On the occasion of the second escape, November 8, 1941, Miss Callahan was one of fifty patients using the grounds in the charge of a nurse who was assisted by two attendants. No one of such persons had been informed or had any knowledge of the patient's earlier escape with suicidal intentions, or had been given any

instructions as to special care to be extended to, or observation made of, the patient.

The State rests its defense upon the proposition that the injuries arose out of the hospital's following the established practice for rehabilitation of patients afflicted with the mental disease from which Miss Callahan suffered — manic depressive psychosis, manic type — the main objects of which treatment are to give to the patient " as much liberty as seemed safe," and keep her free from the feeling of being observed, to counter which measure Miss Callahan bound herself to the terms set forth on " an honor card " which she signed, thereby agreeing to confine herself solely to the privileges granted.

Established facts strongly challenge the manner in which the medical theory outlined was carried out.

On three separate occasions Miss Callahan was placed on " open ward " with privilege of using hospital grounds, the first time in March of 1941, when within less than a month such privilege was withdrawn as the patient had become restive. Thereafter the patient was confined to " closed ward " under constant control and observation until September 24, 1941, on which same day she effected her first escape.

Upon being apprehended the following day several miles from the hospital she was examined by a staff physician, to whom she related " I want to get away and commit suicide." This statement was entered upon the official records of the hospital. Following such escape " open ward " privileges were again withdrawn, but restored on November 6, 1941. On November 8th following, about 1:00 P. M., the patient was reported missing. On November 13, 1941, the patient was found five or six miles from the hospital and returned to the hospital by members of the State Police.

When located Miss Callahan was scantily clothed; her feet were bare and she was in an unkempt condition, with feet so swollen and frozen that she was unable to walk. Combined investigation by State Police and examination and questioning by hospital staff physicians revealed that during her six days' absence she had on the first day out, jumped into a waist-deep pond in an effort to drown herself, but finding the water extremely cold climbed out and wandered around unsuccessfully seeking shelter, until she found a small, open, unheated, private garage. Upon a bench in the garage she had lain in her wet clothes for nearly six days — without food or drink — until accidentally discovered on the sixth day by the garage owner, who, after feeding her and giving her protection, notified the State Police.

The hospital authorities had ample warnings concerning Miss Callahan's strong tendency toward escape and suicide, entirely aside from the fact that she had made such statement to a staff physician upon her return to the hospital following the first escape.

Through witnesses called on behalf of the State, it was clearly established that the mental trouble of Miss Callahan rendered her a potential suicide, regardless of any expression to such effect; that she had a tendency to commit suicide from the time she was confined to the hospital, " as it is well to regard depressed conditions as a possible suicidal tendency; " and that a general rule of the hospital to persons in charge is to be aware of and on guard against suicidal attempt.

The State maintains that the statement made to the staff physician, in charge upon Miss Callahan's return from the first escape, was not to be taken seriously since there was no overt attempt on the part of Miss Callahan on the occasion of her first escape actually to commit suicide. In testimony offered on behalf of the State it was sought to establish that, unless the doctor considered the statement as dangerous, there was no occasion for special care and observation of Miss Callahan, for, if there had been, she should then have been placed in a closed ward and under constant supervision.

The further fact was established, through a witness called by the State, that a certain percentage of violations of privileges is to be expected.

The State, in support of its contention that Miss Callahan's statement of September 25, 1941, concerning her desire to commit suicide, was not to be taken seriously, points to her opportunity and failure to do so on November 6, 1941, when she was actually in the waist-deep pond. Had the pond been sufficiently deep for the purpose she doubtless would have drowned, since she encountered a very considerable difficulty in climbing out of it. A further answer may be found in the prevailing temperature of open water in northern New York during November, which well might awake even a sick mind from the delusion of suicide as an end to this world's problems.

We believe the statement concerning a desire to end her life was made with all the seriousness that Miss Callahan's unstable mind could bring to bear on the subject.

The State had numerous warnings as to Miss Callahan's propensity to suicide but allowed them to go unheeded. Certainly upon transfer to an open ward on November 6, 1941, it would seem that the chief of the division and the nurse

immediately in charge should have been made acquainted with Miss Callahan's condition and inclinations; neither was so notified.

It is well-established that for the negligence of its agents and servants the State is liable for injuries suffered by an inmate of a State institution; and that following a first escape, the State, having been put upon notice, thereafter must exert extraordinary precautions to prevent a second escape. (*Martindale* v. *State of New York,* 244 App. Div. 877, affd. 269 N. Y. 554; *Shattuck* v. *State of New York,* 166 Misc. 271, affd. 254 App. Div. 926.)

The escapes in the cited cases were from closed wards where the patients were in confinement and, theoretically at least, under close observation.

In the instant case the escapes might well be considered even more flagrant, since they were made from open hospital grounds, except as such use of the grounds is claimed to be an essential part of the medical attention prescribed as a means of rehabilitation.

We find that, since the State had ample notice of Miss Callahan's desire to leave the hospital and commit suicide and failed to heed such warnings, it is guilty of negligence.

Claimants' ward we find to have been free of contributory negligence.

Claimants' ward, since April 30, 1942, has sufficiently recovered to be eligible to go home with her relatives, a probation practice preceding full discharge, if conditions warrant. Her chances of full recovery are good, as more patients suffering from her ailment recover than become chronic.

The injured patient was a school teacher by profession, having had fifteen years' tenure in the Mechanicville, N. Y., Public School System, upwards of ten years of which represent the period of her teaching following her discharge after confinement in Utica State Hospital during the years 1925-1926.

At the time of trial herein Miss Callahan had reached a point on the eligible list of teachers " next to be recalled." The superintendent of the school system testified that on Miss Callahan's record she would be so recalled, if and when formally discharged from the hospital, except for the fact of her physical handicap, through which she would be unable in an emergency to be of assistance and, likewise, very possibly be unable to maintain discipline. (Education Law, § 312-a, subd. 2, lists physical disability as one of the grounds sufficient for the removal of a teacher.)

At the time Miss Callahan left her school-teaching position she had been earning $1,800 per year.

Concerning Miss Callahan's injuries, the State's brief recites: " * * * very lamentable and are such that challenge human emotions." The facts herein, alone, are sufficient to warrant a substantial verdict in this case. Among the numerous intermediate operations performed in advance of the amputation of both legs, several toes and parts of both feet and legs had been amputated.

Miss Callahan has suffered damages herein in the sum of $25,000 to which claimants herein are entitled, and in addition $219.80 covering medical expenses incurred in procuring artificial legs and concurrent treatment at Albany Hospital, being a total of $25,219.80.