Bessie Burtman, as Administratrix of the Estate of Edmund Burtman, Deceased, Claimant, *v.* State of New York, Defendant. (Claim No. 25673.)

Court of Claims, January 13, 1947.

154

*James H. Glavin, Jr.,* and *Louis M. Mullarkey* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Frank M. Noonan* of counsel), for defendant.

GREENBERG, J.   Claim has been filed to recover damages for the wrongful death of the decedent and for personal injuries, pain and suffering sustained by him prior to his death occasioned through the negligence of the State of New York in permitting its ward to escape.

Claimant's intestate, suffering from manic depressive psychosis, perplexed type, had been confined in 1936 to the Utica State Hospital for treatment.   Upon admission he was assigned to Ward 6, wherein the patients are somewhat restricted and supervised.

Subsequently in December of that year, claimant's intestate was transferred to an open ward, where the patients have the privilege of walking about the grounds unattended, and, with the permission of the doctor, of going to town during daylight hours, and where the confinement is much less than in a ward of the type of Ward 6.   Later, upon being permitted to go home, he was returned in a few days to the institution because of restlessness and placed in Ward 7, the sick, depressive and suicidal ward.   In the latter ward, greater restriction and supervision is maintained over the patients than in Ward 6 or the open wards.

In November, 1937, after being transferred to an open ward (Ward 1), the subject escaped and was apprehended three days later by the Utica police. He was reassigned to Ward 6 and on June 16, 1938, he again escaped. This time he was found twelve days later some seven miles away, returned to the Utica State Hospital and placed in Ward 7, the sick, depressive and suicidal ward, to which elopers would be usually confined. In August, 1938, the subject was reassigned to Ward 6, where he remained until July 10, 1939.

On that day, patients from Ward 6 and other similar wards, partook in a walking or recreational party on the recreation grounds behind the buildings, where there is a large open space having a half dozen roads leading to various buildings and places throughout the grounds and eventually out to the city streets. The recreation or exercise area was not enclosed by fences or gates nor was there any physical barrier to one desiring to reach the outside. Several hundred patients were released from the wards to this area, under the guidance, protection and care of two attendants from each of said wards. The hospital was undermanned. A greater number of attendants should have been assigned to stand guard during this period. The supervision of the patients including claimant's deceased, in the recreational area, was wholly insufficient.

The check employed by this hospital to account for each of the attending patients was that each ward made its own separate physical account of those departing and those returning. Attendant Simpson checked out sixty-eight patients from Ward 6 and Attendant Suits checked in sixty-seven at 3:00 P.M. No comparison was made of the respective counts and this discrepancy or absence was not made known until 4:00 P.M., when the subject failed to respond to a call for assistance in the dining room. The belated search of the grounds and area about the hospital failed to reveal his whereabouts. It was not until September 13, 1939, when the coroner of Herkimer County reported that a body had been found, that claimant's intestate was located. The cause of death was given as "acute cardiac dilitation brought on by exposure and exhaustion."

That the State was derelict in its duty to its ward is evident from the proof in this case. The State failed to take the necessary precautions and to maintain the necessary supervision and control over one who had previously manifested escapist proclivities so as to avoid a further escape and the dire consequences that might ensue. Accordingly, the State must be held to respond in damages. (*Martindale* v. *State of New York*,

244 App. Div. 877, affd. 269 N. Y. 554; *Shattuck* v. *State of New York,* 166 Misc. 271, affd. 254 App. Div. 926; *Callahan* v. *State of New York,* 179 Misc. 781, affd. 266 App. Div. 1054.)

Claimant's medical proof warrants the conclusion that the decedent would have recovered from his illness and resumed his place in society as a normal person. At the time of his death, at the age of thirty-nine years, he left him surviving a widow, age forty-eight years, but no children. Prior to his confinement in 1936, the intestate had been a Works Progress Administration worker, earning but $13.40 weekly. In previous years, however, his earnings as a binder in the rug factories in the city of Amsterdam, varied from as low as $19.44 up to $46.23 weekly.

In determining the pecuniary loss sustained by the decedent's wife, attention has been called to prior adjudications of this and other courts. While they may offer some guide in fixing the amount, this court is indeed mindful of the sharp devaluation of the dollar between the times of the decisions of yesteryear and today. It does not require the recitation of statistics and governmental compilations to establish an acknowledged fact; that the purchasing power of the dollar has greatly diminished in recent times. Such factor has been borne in mind in making the award herein.

Motions to dismiss the claim herein made at the end of claimant's case and of the entire case, upon which decision was reserved, are denied. Accordingly, claimant is awarded the sum of $10,000 (with interest to be entered by the clerk of this court pursuant to Decedent Estate Law, § 132), the total amount of such claim, as damages for the wrongful death of her intestate, and the sum of $2,000 for the personal injuries, pain and suffering sustained by him.

Let judgment be entered accordingly.