MARGARET M. NOTT, as Administratrix of the Estate of CHESTER W. NOTT, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 27897.)

Court of Claims, December 31, 1947.

*Thomas Croucher* and *G. Bradley Anderson* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Arthur W. Mattson* and *Edward R. Murphy* of counsel), for defendant.

LOUNSBERRY, J. Claimant Margaret M. Nott, as administratrix, sues to recover damages for the death of her husband,

Chester W. Nott, who committed suicide by hanging on May 3, 1943, in the city of Newburgh, New York, while on parole from Willard State Hospital.

Chester W. Nott, who was forty-seven years of age, was Superintendent of the English Department in the Batavia, New York, high school for a number of years. He was committed to Willard State Hospital by order of the County Judge of Ontario County, New York, on March 14, 1943. The physicians, who examined him prior to his commitment, were of the opinion that he was "suicidal" and "homicidal". Nott was given the usual physical and psychiatric examinations on his admission to the hospital, and the original diagnosis made of his mental condition was that he suffered from a psychoneurosis of the "reactive depression" type. Finally after two lengthy formal interviews with the Director of the Willard State Hospital, Dr. Kenneth Keill, and Assistant Director, Dr. Walter M. Pamphilon, now Assistant Commissioner of the Department of Mental Hygiene, the diagnosis of his mental condition was changed to an "alcoholic psychosis, pathological intoxication".

Margaret M. Nott, his widow and administratrix, alleges negligence on the part of the State, its agents and employees, in failing to properly diagnose Nott's condition and provide him with adequate supervision, alleging as well the negligence of the State in paroling the said Nott and permitting him to leave Willard State Hospital without supervision. Claimant bases her claim solely on these allegations.

The story of Chester W. Nott's life, as related by his widow, was one of hypochondria, mental turmoil and periodic despondency. According to her, Nott, in his imagination, between 1926 and 1943, suffered from diabetes, cancer, tuberculosis, glaucoma, high-blood pressure, and other allied diseases. He was alternately possessed by feelings of inferiority and futility, jealousy and melancholia. She described his threat, in 1926, to drown himself, his unsuccessful attempt, in 1926, to drive a car in which she and his mother were passengers into a brick wall, another threat, in 1929, to shoot himself, an unsuccessful attempt, in 1934, to hang himself with a blanket, and another threat, in 1936, to shoot himself. She told of his treatment, as a voluntary patient, for two weeks in 1941 at the Syracuse Psychopathic Hospital. She described his attempt on March 5, 1943, to shoot her and then himself, culminating in a struggle in which, after she managed to knock the gun from his hand, he tried to strangle her. Finally, she told how, on March 12, 1943, on

the Shortsville highway near Canandaigua, he tried to drive their speeding car, in which she was riding, head-on into a telephone pole, only, as a considerable anticlimax, to become mired in the mud of the road shoulder. Nott, subsequently the same day, became highly intoxicated, was arrested and the following day, after the customary medical examination, was committed to Willard State Hospital.

Mrs. Nott's testimony, as above paraphrased, was unsupported except, in part, by Dr. Armstrong, their family physician, who was consulted by Nott concerning many of his imaginary ailments, and who had long since concluded that, in his opinion, Nott was " a mental case ". Dr. Armstrong also recalled that Nott had once described to him one of his unsuccessful attempts at suicide by hanging, and testified that sometime thereafter, at Dr. Armstrong's suggestion, Nott entered the Syracuse Psychopathic Hospital. It was Dr. Armstrong and a Dr. Jewett who made Nott's commitment examination. Mrs. Nott signed the commitment papers giving the doctors her version of the incident on the Shortsville highway. During their examination, they questioned Nott concerning this, and while Dr. Armstrong only recalled him as being " evasive ", Dr. Jewett recalled that Nott admitted the attempt but tried to explain it as having been " just. in fun ".

Counsel for the State, in his cross-examination of Mrs. Nott, attempted to show that the decedent's mental troubles stemmed from his unhappy marital life. Claimant, during the ten years Nott was teaching in Batavia, lived with him in a furnished apartment in that city only one school year; the balance of the time Nott maintained a room in Batavia, and returned Friday nights to the home of his mother-in-law in Canandaigua, where claimant resided, for the weekends. Some months prior to March 14, 1943, claimant entered upon her first employment since her marriage. From the evidence, it is safe to assume that Mrs. Nott had partially withdrawn from her husband and that she no longer responded to his dependence upon her for sympathy and mental comfort. The court feels, however, that neither the determination of the probable cause of Nott's breakdown, nor the moral right of his widow to be compensated for his death, is at issue here; the claimant having based her claim solely on the negligence of the State, its agents or employees, in failing to properly diagnose the condition of the decedent, providing proper supervision and permitting him to be released on parole. She argues, first, that the State failed in its duty to provide Nott, as a patient in a State hospital, with

careful and competent psychiatrists. There is nothing in the record to indicate other than that Drs. Raffaele, Vallee, Pamphilon and Keill, all of whom treated or interviewed Nott at Willard, are psychiatrists of the highest qualifications and ability. Whether or not they negligently misdiagnosed Nott's particular case, and then released him while he was still " actively suicidal ", is the real issue involved herein.

Counsel for the claimant has put much stress on the fact that the staff at Willard changed their diagnosis of Nott's condition from a psychoneurosis to an alcoholic psychosis, and he tried to establish that the latter diagnosis was wrong. On this point, Mrs. Nott testified that the decedent was only a " social drinker ", and that he had been drinking but was not intoxicated at the time of the Canandaigua incident. Nott, himself, furnishing personal data on his admission to Willard, according to his hospital record, must have stated that he was a " moderate drinker " and was " occasionally intoxicated ". He also told an interviewer, and there was no reason for him to be untruthful, that he had taken a " couple of drinks " before the disputed final attempt to wreck his car. Afterwards, he said he " really got plastered ". He also told Dr. Keill, the director at Willard, that he (Nott) would never have come to Willard if he " hadn't been drinking ". It is true, as claimant's counsel points out in his very able brief, that there is no evidence in the record that Nott was intoxicated or had even been drinking when he allegedly made his other abortive attempts at suicide; but neither is there any evidence that he had not been drinking at such times. Likewise, there is nothing in the record on the interesting point as to whether or not the decedent was intoxicated or had even been drinking when he finally did successfully commit suicide. Nevertheless, Drs. Keill and Pamphilon did both agree from their study of Nott's record at Willard, and the summary of his case as a former patient at the Syracuse Psychopathic Hospital, and from their own interviews with the decedent, that the excessive use of alcohol was a strong ethological factor in their patient's case, and was the immediate cause of the acute episode (the Shortsville highway incident) that led directly to his confinement. There being no expert medical testimony to the contrary, the court is of the opinion that, from the record, they were reasonably justified in arriving at this conclusion.

But, whatever the diagnosis of Nott's case, the inescapable fact remains that he suicided within forty-eight hours after his discharge. Was he, therefore, actively suicidal at the time of

his discharge? If so, and if it could be shown that the staff at Willard ought to have known this, then surely it would have been negligence to parole him to his own custody, and so to his death. The liability of the State for the negligence of its agents or servants, resulting in an injury to an inmate of a State institution, is so well established that citations are unnecessary. This liability, however, has been quite generally limited to instances of improper or inadequate supervision of confined mentally-ill patients, whose propensities for suicide had been made manifest during their confinement. The cases cited by claimant's counsel, with one possible exception, all fall within this category. (*Spataro* v. *State of New York,* 166 Misc. 418 [1937]; *Dimitroff* v. *State of New York,* 171 Misc. 635 [1939]; *Dow* v. *State of New York,* 183 Misc. 674 [1944].) The possible exception (*Callahan* v. *State of New York,* 179 Misc. 781 [1943], affd. 266 App. Div. 1054), moreover, had features that resemble those in the instant case. Miss Callahan, who likewise was a school teacher, was given " open ward " privileges while an inmate at Utica State Hospital, under the type diagnosis of " manic depressive psychosis ", and, on the day this privilege was granted her, escaped from the hospital grounds through an unguarded gate. When apprehended and returned the following day, she told a staff physician, " I want to get away and commit suicide ". This statement was entered in her hospital record. For the following forty-one days she was kept under close confinement, but then two days after again being placed in an " open ward ", she escaped for a second time and attempted suicide, causing herself serious permanent injuries. There was some evidence that there had been a failure by the staff to advise the attendants, who were in charge of Miss Callahan at the time of her second escape, of the earlier escape with suicidal intentions, and to warn them, therefore, to be on guard against another attempt. The State argued that the privileges granted Miss Callahan were in accordance with an established theory of rehabilitation, but the court apparently disapproved the supervisory manner in which the practice was carried out, and, holding the hospital authorities to ample notice of Miss Callahan's suicidal inclinations, found the State guilty of negligence.

The court is of the opinion, however, that the *Callahan* case and the instant case are distinguishable. Miss Callahan's desire to commit suicide was, by her own statement, made manifest during her confinement. She escaped, and attempted suicide, because of a laxity in her supervision. Nott, on the other hand,

while under some natural tension, was clear and co-operative all during his confinement, and consistently minimized his previous suicide attempts described by his wife, and as set forth in the commitment papers, calling them "dramatic gestures" to gain his wife's attention and affection. Nott had "freedom of the grounds" for some time at Willard, but made no overt act tending towards escape or suicide. He seemed to relax and to be considerably less depressed, although his wife, the claimant, was his chief interest in life, and was much concerned as to whether she might change her expressed opinion of him, and at some future date return to live with him at least on some basis. He was anxious to return to his position at Batavia. He showed, to the trained minds of the psychiatrists in charge, no evidence of a psychosis at the time of his discharge, although he was still "quite hypochondriacal and worrisome". Dr. Keill, in his letter of May 1, 1942, to Dr. Armstrong relating to Nott, said the following, "and having for a period of six weeks shown nothing to indicate the presence of a psychosis, we were unable to keep him in the hospital". Finally, after receiving what was apparently more attention and time than the average routine case, he was paroled to his own custody, it being understood that he was to stay away from his wife, refrain from intoxicants, and report each month to a specified mental clinic. That his discharge on such terms was reasonably prudent, was the considered judgment of the Willard staff.

The psychiatrists called as State witnesses variously interpreted the terms "actively suicidal" and "potentially suicidal". It would appear, from their testimony, that every sane human being is, at some phase of life or under some conditions, potentially suicidal. Dr. Keill, the director at Willard, in describing Nott, very frankly admitted that he considered Nott as still being potentially suicidal on May 1, 1943, but no longer mentally ill, and, therefore, no longer requiring confinement. In fact, under the provisions of the Mental Hygiene Law, Dr. Keill had no alternative but to discharge Nott as soon as he considered him to be recovered. Dr. Keill testified further that, no matter how long Nott was kept under confinement, his basic personality makeup would not change. Nott would always be a hypochondriac and a worrier. If he entered Willard State Hospital a potential suicide, he would leave Willard a potential suicide. The standard of care to which Dr. Keill and the Willard staff was bound was that of a reasonably prudent psychiatrist under similar circumstances;

this has always been the rule. It was a reasonably prudent act to discharge Nott on May 1, 1943, under the stated conditions; since he had apparently recovered from the psychosis which occasioned his admission to Willard, and since he in no way appeared to trained psychiatrists to be actively suicidal, it would not have been reasonable to have kept him longer confined. This was the opinion of Dr. Steckel, Director of the Syracuse Psychopathic Hospital, an expert witness called by the State, and the claimant offered no evidence in rebuttal thereof, or evidence that the State failed to do in the case of Chester Nott what the ordinary, reasonable and prudent psychiatrist would do under the same or similar circumstances.

The claimant has failed to prove the negligence of the State, as alleged, by a fair preponderance of the competent evidence. Therefore motion for dismissal, made by the State at the close of the trial, is granted and the claim dismissed.

Findings of fact and conclusions of law may be submitted in accordance with this memorandum within ten days, otherwise this opinion will be considered the decision.

Let judgment be entered accordingly.