YULA P. ST. GEORGE, as Administratrix of the Estate of FRANK ST. GEORGE, Deceased, Respondent, *v.* STATE OF NEW YORK, Appellant. (Claim No. 30281.)

Third Department, January 27, 1954.

*Nathaniel L. Goldstein, Attorney-General* (*Wendell P. Brown* and *Henry S. Manley* of counsel), for appellant.

*Harry Ander, Harry H. Lipsig* and *Bernard Meyerson* for respondent.

Coon, J.   On March 5, 1950, on a street in Brooklyn, one William Jones, a colored boy then nineteen years of age, stabbed and killed Frank St. George, a perfect stranger, without provocation or apparent motive.   Jones had been released on March 1, 1950, from Matteawan State Hospital for the Criminal Insane. Claimant's theory of the liability of the State is that the doctors and psychiatrists at Matteawan negligently made an erroneous diagnosis of the true nature of Jones' mental illness, and pursuant thereto, improperly released him.   Upon that theory the Court of Claims has granted judgment for damages for the death of St. George, and from that judgment the State appeals.

On February 23, 1947, Jones, then aged sixteen, was sentenced as a wayward minor for a term of three years, and entered Elmira Reception Center, where he remained until June, 1947. He was then transferred to the hospital section at Clinton Prison to determine if he had a tubercular condition.   In December, 1947, he was transferred to the Vocational Institution at West Coxsackie.   About the end of October, 1948, the authorities at Coxsackie began to suspect some mental disturbance in Jones, and on December 20, 1948, the institution physician commenced proceedings which resulted in his examination by Dr. Patry and Dr. Cooper, who diagnosed his case as "psychosis with psychopathic personality.   Paranoid episode."   He was thereupon committed to Matteawan on December 22, 1948, and remained there until March 1, 1950, when his original term of three years expired, and he was then released in the custody of his mother.   He returned home with her and lived in her home until the tragic events of March 5, 1950.   In this five-day period he had been out with some of his friends; consumed some whiskey; apparently had some difficulty with some of his associates; became excitable; thought people were laughing at him and talking about him; once started to return to Matteawan but returned home; and, on March 5, 1950, he came running into his mother's apartment looking for a weapon, and finding none, went out again.   Immediately thereafter he entered a restaurant, seized a bread knife and ran down the street, stabbing seven persons as he went, four of them fatally, including Frank St. George.   This is a brief sketch of the background preceding the fatality.

During all of his stay at Matteawan Jones' condition was consistently diagnosed as psychosis with psychopathic personality.   Looking backward after the tragic events of March 5, 1950, it is undisputed that the proper diagnosis should have

been schizophrenia, paranoid type. It is this erroneous diagnosis which is the crux of this litigation.

There is no claim or suggestion that the staff doctors who had Jones in charge at Matteawan were incompetent or unqualified. Claimant urges that Matteawan was overcrowded and understaffed, and that the diagnosis of Jones' condition was made upon inadequate observation and information. There is a contention that some incidents in his behavior were not recorded, and that some things that were recorded were not presented at the staff meetings. The record discloses, however, that a great deal of attention was given to Jones. He was personally interviewed and examined by the superintendent about ten times during his stay there. Voluminous reports by attendants and doctors recording even minor incidents were presented to the staff meetings, his history at Coxsackie was before the staff, and his case was considered at considerable length at several staff meetings during his stay there of about fourteen months. If any incident affecting Jones was omitted it was of the same nature and part of the same pattern as the voluminous material before the staff meetings. The record discloses entirely adequate material in the case record of Jones for purposes of diagnosis, and one of claimant's experts so testified.

About the last of August, 1949, according to the testimony, the staff had reached a conclusion that Jones had sufficiently recovered to be considered for release except that his sentence had not expired. The doctors did not consider it for his best interest to return him to Coxsackie so he was continued at Matteawan until his term expired on March 1, 1950. In the interval the record indicates that his condition was closely observed, and despite some incidents, the doctors felt he was improving. It is impractical and unnecessary to set forth in detail the case record of Jones at Matteawan. At times it shows him to be quiet and co-operative, engaging in sports and getting along well with others. At times it shows an assaultive disposition with numerous instances of disobedience, quarrels, scuffles and altercations with other inmates, at least many of which were provoked by the other inmates. The record does not disclose that in any of these occurrences was any injury inflicted upon anyone, and most of the difficulties would appear to be petty and such as might occur among any group of boys confined together, even normal ones, and, of course, Jones concededly was not normal, nor were his fellow inmates.

The diagnosis of mental cases is not an exact science. As yet the mind cannot be X-rayed like a bone fracture. Diagnosis with absolute precision and certainty is impossible. One of claimant's experts readily admits having made mistakes in diagnoses, yet says of the Matteawan doctors: "They made a mistake." It has been recognized that insanity is difficult of detection, and frequently is cunningly concealed. (*Warner* v. *Packer,* 139 App. Div. 207.) Of necessity it must be a matter of judgment by those qualified to pass judgment. It was the duty of the staff doctors at Matteawan to treat Jones and to use every effort to improve his condition, not just to confine him. The modern concept of handling cases of mental illness is treatment, not simply incarceration. The objective is to return the patient to society, which should be done as soon as, in the judgment of properly qualified doctors and psychiatrists, it is likely to be safe for others and helpful to the patient. Believing as they did, after observing Jones, discussing his case and reading voluminous reports from attendants, the doctors could not have justified his detention had he sought habeas corpus on March 1, 1950. As indicated above, there is no suggestion that the staff doctors were not competent and qualified and properly educated and trained, and there is no suggestion in the record that they were not sincere and conscientious in making their diagnosis.

Thus the issue is narrowed to this: Are the doctors, or is the State which employs them, legally responsible in damages for an honest error of professional judgment made by qualified and competent persons? We think this question must be answered in the negative. It has been so held in malpractice cases of all types for years. (*Warner* v. *Packer, supra;* *Pike* v. *Honsinger,* 155 N. Y. 201; *Kinsley* v. *Carravetta,* 244 App. Div. 213, affd. 273 N. Y. 559.) Future human behavior is unpredictable, and it would place an unreasonable and unfair burden upon the State if it were to be held responsible in damages for everything that a person does after he has been discharged or released from one of its State institutions, even though the release was through an error of judgment, unless there is something more present than is contained in this record.

There is no case in New York which has heretofore imposed liability under the circumstances presented here. To sustain this judgment would be to extend liability beyond any point heretofore reached, which we are unwilling to do. (See *Statini* v. *State of New York,* 202 Misc. 689.) Other jurisdictions have not looked with favor upon cases of this type. (Cf. *Bollinger*

v. *Rader,* 151 N. C. 383; *Emery* v. *Littlejohn,* 83 Wash. 334; *Cappel* v. *Pierson,* 15 La. App. 524, and *Kendrick* v. *United States,* 82 F. Supp. 430.)

The " escape " cases, such as *Weihs* v. *State of New York* (267 App. Div. 233) and *Jones* v. *State of New York* (267 App. Div. 254), and many others, are readily distinguishable. In those cases it was *known* that the patient was suffering from a type of insanity requiring confinement and should not be at large and might do harm. The negligence lay in permitting the escape.

In considering this case it is difficult to free the mind from the events of March 5, 1950, subsequent to Jones' release, and " second guessing " is easy, but the diagnosis in question here was made before those events occurred and with no reasonable basis for anticipating that they ever would occur. Likewise, the case presents a strong sympathetic appeal. An innocent person was killed for no reason at all, yet that is one of the risks of living in modern society. Many innocent people lose their lives or are injured by insane persons who have never been committed to an institution; by criminals, and by accidents of all sorts and descriptions for which they were in no way responsible.

To sustain this judgment would have a more far-reaching effect than the money damages. In its practical aspects it would mean that the State could release no one from any State mental institution without being under the risk of liability for whatever he did thereafter, and the result would necessarily be reluctance to release and the unnecessary confinement of persons who would benefit by release. (*Excelsior Ins. Co. of N. Y.* v. *State of New York,* 296 N. Y. 40, 46.) Tragic as the occurrence was, there is no legal basis for liability of the State.

Having reached this conclusion there is no need to pass upon other questions raised.

The judgment should be reversed and the claim dismissed, without costs.

Foster, P. J., Bergan, Halpern and Imrie, JJ., concur.

Judgment reversed, on the law and facts, and the claim dismissed, without costs. The findings of fact and conclusions of law contained in the opinion of the court below which are inconsistent herewith are reversed, and new findings of fact and conclusions of law in accordance with the opinion herein are made. Settle order on notice.