SALVATORE R. GIOIA, as Administrator of the Estate of JOSEPH D. GIOIA, Deceased, Appellant, *v.* STATE OF NEW YORK, Respondent. (Claim No. 36174.)

Fourth Department, December 10, 1964.

182

*Darch, Noonan & Hughes* (*Stephen B. Hughes* of counsel), for appellant.

*Louis J. Lefkowitz, Attorney-General* (*Paxton Blair* and *Jean M. Coon* of counsel), for respondent.

GOLDMAN, J. This is the second time this case has been before this court. On the first occasion the State appealed from a judgment in favor of the claimant. By a divided court the judgment was reversed and a new trial granted (*Gioia* v. *State of New York,* 16 A D 2d 354). Upon retrial the Court of Claims Judge found " that the suicide was the result of a reasoned and deliberate determination of a sane person " and dismissed the claim (38 Misc 2d 833, 836).

The facts recited in our earlier opinions will not be repeated here. We found that " The evidence sustains the conclusion of the Court of Claims Judge that the hospital staff had not maintained adequate surveillance to prevent the decedent from committing suicide " (p. 356), and that the award of $40,000 was a fair one. There is nothing in the instant record to affect the validity of these two findings. The reason for ordering the new trial was that " The issue of the defendant's mental condition at the time of his suicidal act was not tried out in the Court of Claims and was not passed upon by the Judge " (p. 359). We shall therefore concern ourselves primarily with the issue of decedent's mental condition at the time he took his own life.

On the second trial the proof submitted by the State was substantially the same as in the first trial. It used, by stipulation, the prior testimony of six of its witnesses and actually presented only one of its prior witnesses for oral testimony. The State produced but one new witness whose testimony was brief and in no way strengthened its case. The claimant, on the other hand, not only presented the testimony of the same witnesses it used at the first trial, but substantially bolstered its proof by five new witnesses, all of whose testimony bore on the behavior and mental condition of the decedent. The claimant further produced an additional psychiatrist as an expert witness whose professional judgment was that the decedent was mentally ill and did not know the consequence of his self-destructive act. In our judgment this new testimony, along with that previously produced, clearly established a preponderance of evidence in the claimant's favor.

The claimant's burden of proof required that he demonstrate that at the moment of the suicidal act decedent was legally insane. The area of disagreement in this court upon the prior appeal centered upon the sufficiency of proof on this issue. The Presiding Justice in dissenting found sufficient proof in two documents " which would support a finding of fact that the claimant committed suicide while temporarily insane " (p. 360). The prevailing opinion indicates that the majority of this court did not find that these two documents standing alone were sufficient, in the light of the inadequacy of the other proof. We, therefore, now turn to the second record to see what additional evidence was produced to support a finding of temporary insanity at the time of the suicidal act.

The present record contains ample evidence to support a finding that the decedent was temporarily insane and could not resist the impulse for self-harm which resulted in his death. The rule of law to be applied under these circumstances was clearly enunciated in *Franklin* v. *John Hancock Mut. Life Ins. Co.* (298 N. Y. 81, 84) in which the Court of Appeals was dealing with a provision of a life policy excluding death by suicide. The court found the exclusion " inoperative if the insured at the time of his suicide was so far insane as to have been without appreciation of the physical consequences of his action or without power to resist the disordered impulse that impelled him to end his own life. [Citing cases.] "

Claimant produced evidence that decedent had spoken of self-destruction more than a year before the act was actually consummated. In furtherance of this declared intent decedent

drove his automobile into a telephone pole, injuring himself and demolishing his car. Secondly, after his arrest for the alleged murder of his wife, he jumped out of a second-floor window in the State troopers barracks with no hope of escape but under circumstances which raise the inference that he once again was intent upon destroying himself. The motive of possible escape is completely negated by his voluntary surrender of himself without resistance at the time he was originally apprehended. The complete absence of any reason or motive for the murder of a wife who had borne him four children and with whom he "had gotten along well" during their six years of marriage is another important circumstance. The District Attorney of Genesee County and police officers testified to his abnormal conduct while he was in the hospital in Batavia before his transfer to the Rochester State Hospital. The record of the Batavia hospital indicated that decedent's conduct was so irrational that full suicidal precautions were ordered to be used by those caring for him. The Sheriff informed the State hospital authorities to whom decedent was transferred that extreme caution should be used in guarding the patient and he offered to supply deputies to assist in guarding the patient but this offer was declined by the State hospital. The Sheriff's letter to this effect, which was a part of the State hospital record and was an exhibit on the first trial, was improperly excluded on the second trial and should be considered a part of the evidence. From the records of the Batavia hospital and the surgeon, who had there treated decedent, the authorities at the State hospital knew that he was in " a marked state of depression ". The State's knowledge of his deranged state of mind was evidenced by the fact that upon admission he was ordered into seclusion with full security precautions to prevent suicide. The State hospital record indicated that decedent's condition was classified as " Psychoneurosis — reactive depression " and that he was " disturbed and destructive ". It also gives the nature and cause of suicide as " Asphyxiation by strangulation while temporarily insane ". This was signed by Dr. Terrence, Director of the hospital. The official certificate of death gives support to Dr. Terrence's conclusion by stating the cause of death as " Asphyxiation by strangulation while temporarily insane ". This latter certificate is presumptive evidence of the facts therein alleged. (Civ. Prac. Act, § 367 [CPLR 4520]; Public Health Law, § 4103; *Brownrigg* v. *Boston & Albany R. R. Co.,* 8 A D 2d 140, 141.) The State's psychiatrist who had examined the decedent admitted that his condition was that of one who was suffering from great depression and that there was the

likelihood that a person who had made an attempt to commit suicide would make further attempts at self-destruction.

The State's expert readily admitted it was difficult for him to make a definitive finding of sanity or the lack of it in less than 30 days and surely not in the very short stay of less than 3 days which decedent had in the State hospital. Assuming knowledge that a patient's mental imbalance or disturbed psyche is such that suicidal proclivity either has been demonstrated or can be reasonably anticipated and foreseen, a duty arises to frustrate that which is likely or foreseeable by the exercise of at least ordinary and reasonable care. Liability does not attach only after an adjudication of incompetency, or a finding of insanity as the result of an inquiry pursuant to sections 658 to 662 of the Code of Criminal Procedure. The responsibilities of custody arise upon admission and the duties to the patient are not suspended pending a finding of either sanity or insanity in accordance with some legal definition. A combination of notice of suicidal tendency and lack of proper supervision of a person about whose sanity there is doubt and who shortly thereafter kills himself " while temporarily insane " should result in liability in accordance with the well-established principles of negligence law, including the important element of foreseeability (*Santos* v. *Unity Hosp.*, 301 N. Y. 153; *Martindale* v. *State of New York*, 269 N. Y. 554; *Wilson* v. *State of New York*, 14 A D 2d 976; *Daley* v. *State of New York*, 273 App. Div. 552, affd. without opinion 298 N. Y. 880; *Hignite's Administratrix* v. *Louisville Neuropathic Sanitorium*, 223 Ky. 497).

The trial court's finding of sanity was against the weight of the evidence. A review of the proof presented by the claimant of the actions of decedent which were climaxed by the weird spectacle of a man tying an Ace bandage, amazingly furnished by the hospital, around his neck and exerting such great pressure upon the ends of the bandage that he succeeded in strangling himself constrains us to find that decedent was insane when he committed suicide.

Inasmuch as the claim was dismissed the trial court did not reach the question of damages. Upon the prior appeal, as heretofore stated, we impliedly approved the award as made upon the first trial. We therefore fix damages in the sum of $40,000 for the wrongful death of claimant's intestate and the sum of $1,124 for funeral expenses.

The judgment should be reversed and judgment directed in favor of claimant in the sum of $41,124.

WILLIAMS, P. J., BASTOW and DEL VECCHIO, JJ., concur.

186

Judgment unanimously reversed on the law and facts, with costs and judgment directed to be entered in favor of claimant in the sum of $41,124 with interest thereon. Certain findings of fact and conclusions of law disapproved and reversed and new findings and conclusions made.