ELLEN F. COHEN, as Administratrix of the Estate of ALAN D. COHEN, Deceased, Respondent, v STATE OF NEW YORK, Appellant. (Claim No. 57074.)

Third Department, April 15, 1976

*Louis J. Lefkowitz, Attorney-General (Ruth Kessler Toch* of counsel) and *John S. Zachary, P.C. (Joseph E. Magnotti* of counsel), for appellant.

*Aaron J. Broder* and *Seymour Madow* for respondent.

HERLIHY, J. Alan Cohen, the claimant's intestate (referred to herein as decedent) was 23 years of age, married, and at the time of his death, April 22, 1971, he was a third-year medical student at the Downstate Medical Center University of the State of New York. Prior to admission as a medical student he had graduated from the University of Rochester, receiving a Bachelor of Arts degree, with a major in psychology.

In January, 1971 he voluntarily entered the Downstate Medical Center psychiatric department for a condition diagnosed as paranoid schizophrenia. He had prior to this admission been an out-patient at the psychiatric ward of the Kings County Hospital. Upon admission he was assigned to Ward 52, which consisted of 32 beds, with an open door, and a program organized around the concept of a therapeutic community. There were five nurses and generally five aides, together with members of the medical staff, occupational therapists, psychology staff and social workers.

On his admission record there was a statement that the decedent had shown suicidal potential and it is readily apparent from a reading of the record that the doctors and nurses in attendance had knowledge of the decedent's suicidal potential.

Culling from the 32-page decision of the Judge of the Court of Claims, his finding of liability is based upon the following:

"I find that the defendant, in the form of the State University of New York, Downstate Medical Center and its employees, including physicians (see, *Bing v. Thunig,* 2 N Y 2d 656, 666, 667) did not treat or supervise the decedent with the ordinary and reasonable care and diligence, or with that medical judgment and skill required by the acceptable standards of the community.

"I also find that Dr. Sverd, the treating physician, did not, at this point in his medical career, possess the requisite skill or trained psychiatric judgment to, essentially unsupervised, provide ordinary and reasonable psychiatric medical treat-

ment and care to this decedent. See *Pike v. Honsinger,* 155 N. Y. 201, 209, 210 and *Zophy v. State of New York,* 27 A D 2d 414, 416. See, also, *Meiselman v. Crown Heights Hospital,* 285 N.Y. 389; *Benson v. Dean,* 232 N.Y. 52; *Fatuck v. Hillside Hospital,* 45 A D 2d 708; *Wright v. State of New York,* 31 A D 2d 421, 423; *McGovern v. Attie,* 30 A D 2d 559; *Herold v. State of New York,* 15 A D 2d 835."

And also:

"In the case at bar there was much more than a mere error of judgment. There was not one but many errors of judgment made by a doctor not qualified in an unsupervised status to make a judgment; made by those in supervisory capacity; and, all made without careful examination."

The rule of law is well established that a doctor is not liable for a mere error of judgment provided he does what he thinks is best after a careful examination. (See *Benson v Dean,* 232 NY 52; *Pike v Honsinger,* 155 NY 201, 210; *Collins v State of New York,* 23 AD2d 898, affd 17 NY2d 542; *Trapani v State of New York,* 23 AD2d 709; *Gioia v State of New York,* 22 AD2d 181; *Muhlmichl v State of New York,* 20 AD2d 837; *Szostak v State of New York,* 20 AD2d 828; *Wilson v State of New York,* 14 AD2d 976, mot for lv to app den 11 NY2d 643.)

The issue in this case is whether or not the defendant's doctors made a careful examination of the decedent and then exercised reasonable medical care in determining that the decedent should not be restricted to the ward on April 22, 1971.

As found by the court, the treating physician was not a qualified psychiatrist (Mental Hygiene Law, § 27, subd 4) and had only just started on the many years of residency required to attain certification. In recognition of this system of having residents handle the immediate contact and treatment of patients, the defendant had an established hierarchy to provide medical care which in the decedent's case was: Dr. Bjork (attending doctor); then Dr. Rosenberg, a third-year resident; and then Dr. Sverd, a first-year resident and treating physician.

The determinative factual issue is whether or not a qualified psychiatrist was actively supervising the care of the decedent. In this case only Dr. Bjork could have been such a doctor and the court found that the record did not establish that she had made any informed judgment in April of 1971 as to the decedent's suicide propensities.

Dr. Bjork testified that as of April 14, 1971 she formed the opinion based upon observation of decedent in the ward and discussion with Dr. Sverd and other members of the facility having contact with decedent that he should be prepared for discharge from the hospital. She knew that the decedent had made statements to the hospital staff about suicide. However, there is no evidence of any prior attempts at suicide by the decedent. The practice was for patients to be discussed at team meetings held about three times a week. Dr. Bjork testified that it was "bad judgment" to let the patient off the ward on the day of death.

While this record establishes that patients were discussed at team meetings, it is not established that any evaluation of this decedent's suicide propensities was made by a qualified psychiatrist during his stay at the hospital. While there are inferences of judgment being made by Dr. Bjork, there is nothing in the hospital records to support a finding that she ever made a medical judgment fully based upon the nurses' notes and any kind of personal interview. The fact that the decedent was himself a medical student at Downstate may have influenced the staff in exercising its judgment.

What happened in this case was the result of ill-defined policy, in the present circumstances, as to the power of floor nurses to impose restraints on a patient's freedom and requiring full evaluation by qualified psychiatrists at periodic intervals. The fault herein is not with Doctors Bjork, Rosenberg or Sverd as individuals, but rather with the lack of policies requiring more direct management of a patient's treatment by a qualified psychiatrist.

While the court might have given more credence to the assertions of Dr. Bjork that she was fully informed than it did, the fact remains that the record does not contain any written evidence by her or any qualified psychiatrist as to suicidal propensities in and about the time of death. Indeed, she conceded that the decedent should not have been allowed off ward on the day of death in view of the nurses' observations.

On the whole, the record contained questions of fact as to supervision and whether or not any qualified medical judgment as to suicidal propensities and restraint was made in view of his behavior in the last part of his hospitalization. The failure to keep detailed and proper medical notes makes the present situation, under these circumstances, more than an error of medical judgment.

The notice of appeal was "from each and every part of said Order and Judgment as well as the whole thereof". While no issue is raised in the defendant's brief as to the quantum of the judgment, from a reading of the record and in the interests of justice, the court is compelled to review the issue.

As previously mentioned, the decedent was 23 years old, married, and in his third year of medical school. The court found that the claimant had not sustained her burden of proof that the decedent would have been accepted back into medical school and successfully pursued his career as a doctor. We affirm that finding. The record further establishes that at the time of the decedent's death, the claimant was working and was the chief source of support for herself and the decedent. In fact, the bill of particulars submitted by the claimant alleges: "12. Decedent was a student and did not make any contributions to any of the next of kin." At the time of the trial and for some time prior thereto the claimant had remarried.

The query then is—what was the basis for the court awarding damages in the amount of $150,000? From a reading of the court's decision, it appears to be based upon the following:

"I have considered that Alan was a bright, well-educated, young man who very probably, with a proper and sufficiently long enough course of treatment, would have returned to a useful and productive place in society. I believe, however, that his condition would always have been somewhat fragile and that his work would have to be in fields not subject to the pressures of executive or professional life."

In our opinion, under such circumstances, the award of damages is clearly excessive, there being no fair basis for the same. In actions initiated in the Court of Claims, on appeal this court has the authority and duty to make new findings when necessary or required (cf. *Blassman v State of New York,* 282 NY 522, 524). We find, premised on the entire record, that the award is grossly excessive and, accordingly, modify the same and make a finding that the claimant is entitled to the sum of $35,000 with appropriate interest and costs.

The judgment should be modified, on the law and the facts and in the interests of justice, by reducing the damages awarded to claimant from $150,000 to $35,000, together with appropriate interest, and, as so modified, affirmed, with costs. Settle order on notice.

REYNOLDS, J. (dissenting). We cannot agree that the State should be liable for the tragic death of claimant's intestate on the basis of the evidence presented in the instant record. Concededly, the only duty the State owed to the decedent was to exercise reasonable care to protect him from himself (e.g., *Hirsh v State of New York,* 8 NY2d 125). The majority does not find such a lack of care on the basis of negligence on the part of Dr. Sverd, thus implicitly finding his actions to constitute no more than an error in judgment, or in the decision to utilize "milieu therapy" or the "open door policy" as a course of treatment for decedent's malady. Rather, fault is, in effect, found on the ground that Dr. Bjork did not adequately supervise Dr. Sverd considering that he did not yet possess the requisite skill or training to act in an unsupervised manner. In our opinion the supervision afforded Dr. Sverd by Dr. Bjork was more than adequate.

It is clear that Dr. Bjork thoroughly and continuously reviewed Dr. Sverd's progress notes and reports, and decedent's progress and condition were regularly discussed at team meetings attended by Dr. Bjork. The fact that Dr. Bjork, herself, did not conduct a personal evaluation and enter her conclusion based thereon, cannot be said to amount to negligence and in any event was not the proximate cause of the death of claimant's intestate. Instead, if there be any fault at all, it lies in the judgmental decision of Dr. Sverd and for that the State, as noted, is clearly not liable.

Accordingly, we would reverse the judgment and dismiss the claim *(Kardas v State of New York,* 24 AD2d 789).

GREENBLOTT and MAIN, JJ., concur with HERLIHY, J.; KOREMAN, P.J., and REYNOLDS, J., dissent and vote to reverse in an opinion by REYNOLDS, J.

Judgment modified, on the law and the facts and in the interests of justice, by reducing the damages awarded to claimant from $150,000 to $35,000, together with appropriate interest, and, as so modified, affirmed, with costs. Settle order on notice.