John Bell, Respondent, et al., Plaintiff, v New York City Health and Hospitals Corporation et al., Appellants.

Second Department, December 6, 1982

APPEARANCES OF COUNSEL

*Frederick A.O. Schwarz, Jr., Corporation Counsel* (*Michael Gage* and *Carolyn E. Demarest* of counsel), for appellants.

*Kramer, Dillof, Tessel, Duffy & Moore* (*Lawrence B. Brennan* and *Charles F. McGuire* of counsel), for respondent.

OPINION OF THE COURT

Titone, J.

The primary issue presented on appeal is whether the decision to release a psychiatric patient from a hospital without a proper medical examination may provide a basis

for the imposition of liability for injuries suffered as a result of the patient's attempted suicide shortly after his discharge. We hold that it does.

Plaintiff John Bell was admitted to the adult psychiatric unit of Kings County Hospital on September 3, 1976, pursuant to a court order obtained by his wife, plaintiff Linda Bell. He was released on September 10, 1976 upon the recommendation of his treating psychiatrist, Dr. Allan J. Hermann, one of the named defendants. On September 17, Mr. Bell attempted suicide by dousing himself with gasoline and setting himself on fire.

Subsequently, Bell and his wife commenced this action to recover damages for malpractice. The jury awarded Bell $564,225, but found in favor of the defendants with respect to Linda Bell's claim for damages for loss of consortium. An appeal has been taken by the defendants, who raise only the question of liability as to John Bell; no challenge is made to the amount of damages awarded. Linda Bell has not cross-appealed from the portion of the judgment in favor of the defendants and against her.

John Bell has a long history of psychiatric disorder. He was given a medical discharge by the Army in 1971 and obtained treatment from the Veteran's Administration (V.A.) Hospital following a suicide attempt. Indeed, the records of the V.A. Hospital state that Bell had attempted suicide on three occasions.

According to Linda Bell, for a period of time before September, 1976, her husband was acting "strangely". He had religious hallucinations and preoccupations and believed that he and his oldest son had to die. On September 3, 1976 Mrs. Bell sought assistance from the Family Court, Kings County, due to her husband's assaultive behavior

Dr. David Fuchs, a court-appointed psychologist, examined Mr. Bell and found him to be "actively psychotic and suspicious" and concluded that he "poses [a] threat to himself and others". Mrs. Bell stated that she informed Dr. Fuchs of her husband's prior suicide attempts, but the Family Court records contain no indication to that effect. According to Dr. Fuchs, Bell appeared to be "no longer in contact with reality" and his schizophrenia appeared to be

"a worsening" of "a chronic condition". Dr. Fuchs was of the view that unpremeditated suicide was a possibility. Bell was remanded on September 3, 1976 to Kings County Hospital for 30 days for stabilization and planning. Typically, adults are returned to the Family Court 7 to 15 days after such a commitment.

Bell was physically examined upon his admission to the hospital and was given thorazine. It was conceded by the admitting physician that her note of admission in the medical chart was not "specific enough" concerning the patient's condition. Linda Bell visited her husband daily after work and found his condition unchanged. According to Mrs. Bell, every night her husband told her not to visit him and stated that "[t]omorrow I'm not going to be here, so don't bother to come back."

Dr. Allan J. Hermann, chief of the adult psychiatric unit at Kings County Hospital since 1972, first saw the patient on September 7. Dr. Hermann estimated that he saw anywhere from 20 to 60 patients per week. He explained that his primary purpose was to stabilize patients and make a recommendation for aftercare treatment or continued hospitalization.

The doctor was informed about the recent death of Bell's parents and brother, his history of drug abuse and his medical discharge. He denied that he was told anything by Mrs. Bell about the patient's prior suicide attempts. After speaking with the patient and Mrs. Bell, Dr. Hermann made the following diagnosis: "1. Schizophrenic Reaction, Acute Paranoid type. 2. Chronic Drug Abuse". With regard to the patient's condition the psychiatrist wrote: "He claims that he has been hearing voices telling him not to use drugs for the past week * * * [T]he voices he has been hearing for a week repeats [sic] Jesus Christ giving him his 'abundance'. By abundance he means better times are coming. He refuses to discuss his past psychiatric history".

Dr. Hermann further noted that the patient: "does not feel he belongs in a hospital and wishes to go home * * * [H]e claims that Jesus Christ loves him and [the patient] walks about the ward clinging to his bible. There is no evidence of any formal thinking disturbance. However, he

is very suspicious in that he expects the interviewer to allow him to read the medical chart * * * There is no clear delusional thinking but there is a considerable amount of suspiciousness on his part and preoccupation of Jesus Christ loving him. He is a potential danger to others * * * No evidence of suicidal risk * * * Insight and judgment are impaired." The recorded "disposition" was "observation".

Dr. Hermann acknowledged at trial that he made no effort to obtain information concerning the patient's medical and treatment history while he was at the V.A. Hospital. The doctor admitted that this was a departure from accepted medical practice since such information may have been helpful regarding the objective of stabilization and future treatment.

A nurse interviewed Bell on September 7. During the interview he observed that the patient "became quite restless as though he was hallucinating". The nurse noted that Bell "was interrupted several times during the interview because of hearing voices". He wrote, "I'll continue talking with the patient on a one-to-one basis and build trust with him and doctor." No inquiry was made by the nurse concerning the auditory hallucinations.

Dr. Hermann acknowledged at trial that auditory hallucinations could lead a patient to kill himself or others, depending on the hallucinations. With respect to the voices the patient was hearing on September 7, Dr. Hermann admitted that it was a departure from accepted medical practice for him not to inquire as "to what he [Bell] was hearing, who he was hearing it from, when he was hearing it, and whether he could control it or not, and whether he believed it or not."

Dr. Hermann agreed that proper medical practice required that inquiry be made into the nature and circumstances of a patient's delusions. The delusions presented a possibility of harm to Bell and others.

A nurse's note dated September 8 reads that the patient was "[a]wake since change of tour. Delusional and restless."

On September 9, several significant events occurred with reference to the patient. Barbara Martin, head nurse

on the floor for the midnight to 8:00 A.M. tour, deemed the patient to have been worse on that day than on any other day. A nurse's note for September 9 reads that the patient was "[a]wake, delusional, became physically resistive when attempts made to medicate patient. Necessary to place in [restraint]". Bell, pursuant to orders of another physician, was placed in a straightjacket from 1:00 A.M. until 6:00 A.M. Dr. Hermann also prescribed more thorazine for Bell on September 9 than on any other day during the patient's hospitalization.

On the same day, however, Dr. Hermann determined that Bell could be released. He wrote: "After being in the hospital for several days, the patient has shown some improvement * * * He no longer is experiencing any hallucinations and is not willing to go to a V.A. hospital for inpatient treatment. However, he is interested in attending a V.A. Clinic for aftercare treatment. His wife is willing to take him home and it was pointed out to both her and the patient that aftercare treatment will be necessary. The patient is not a danger to self or others at this time * * * [M]y recommendation is that the patient be allowed to return to his home and proceed making arrangements for aftercare treatment at the V.A. Clinic".

In addition to the need for aftercare treatment, Dr. Hermann considered it important that the patient continue to take prescribed medication following his release. He testified that he deemed it advisable for Bell to remain hospitalized in order to insure that the patient took prescribed medication. However, Dr. Hermann maintained that the only basis upon which he could keep Bell in the hospital was if the patient presented a risk to himself or others. Dr. Hermann testified that he told Mrs. Bell that her husband was to take prescribed medication and receive aftercare treatment. Mrs. Bell denied that the psychiatrist so informed her as to these matters.

The following was elicited from Dr. Hermann on cross-examination by counsel for plaintiffs:

"Q Doctor, can you answer my question and relate it to this specific case. Was John Bell stabilized on the 9th?

"A According to my note, yes, he was.

"Q And according to the nurse's note he wasn't; is that true?

"A The note that the nurse wrote was on the 7th, not on the 9th. He was receiving 600 milligrams of Thorazine a day.

"Q Doctor, let me ask you this: Do you consider a delusional patient stabilized?

"A Stabilized enough so that he did not have to remain in the hospital. It depends on the delusion. There are delusional patients who are stabilized enough to go for outpatient treatment. I do not think that a delusional patient should not get treatment. I'm just saying a delusional patient does not have to necessarily remain in a hospital.

"Q Depending on the delusions.

"A Depending on the delusions.

"Q Doctor, the record says 9/8/76: 'Awake since change of tour. Delusional and restless.' 9/9/76: 'Awake, delusional.' Is there any indication, Doctor, that the important element that you just mentioned, namely inquiry into the type and circumstances of the delusions, were made?

"THE COURT: Read the last question.

"(Last question read by court reporter.)

"A No.

"Q And that's a departure from accepted medical practice, isn't that true, Doctor?

"A Yes.

"Q And, Doctor, you didn't make any inquiry into the nature and circumstances of the delusions, isn't that true?

"A I don't have it listed in the chart.

"Q Doctor, if you made such important inquiry into the nature and circumstances of the delusions, that's certainly something that would find its way into the chart in accord with accepted medical practice, isn't that true?

"A Yes.

"Q Is there anywhere in the chart that it says anything about that inquiry?

"A The only thing that the chart says was the dictated note that there was no clear delusional thinking, but there is considerable amount of suspiciousness on the part of — on his part, and the preoccupation of Jesus Christ loving him.

"Q That's the note written on the 7th, isn't that correct?

"A Yes.

"Q And yet the nurse's notes on the 8th and 9th said delusional and no inquiry was made, isn't that correct?

"A According to the chart, that's correct.

"Q Doctor, the voices described by Nurse Brown might well have been voices indicating harm, isn't that correct? She never made her follow-up inquiry.

"MR FREEDHAND [attorney for defendants]: Object to that. Calls for speculation.

"THE COURT: No, overruled.

"A It's always possible.

"Q And, Doctor, the delusions that Mr. Bell was having on the 8th and 9th into which no inquiry was made might well have been delusions that would endanger him or others, isn't that true?

"A It's a possibility.

"Q And yet, Doctor, you wrote on the 9th that this man was no threat to himself or others, isn't that true?

"A Yes.

"Q Doctor, wasn't it a departure from basic accepted medical practice for you to write that in the record without inquiring into those voices and into those delusions further?

"A Yes."

On the morning of September 10, John Bell was discharged from the hospital. He was given a prescription for thorazine and was to be returned by a hospital employee to the Family Court for judicial approval of his release. In an examination before trial, Dr. Hermann maintained that Mrs. Bell was at the hospital when her husband was released, although at trial he was not sure if she was in fact present. According to the discharging nurse, her notes indicate that Mrs. Bell was not present when the patient was released.

John Bell returned home. His wife maintained that she did not know that he was being released. She testified that his condition had not improved and he was screaming that that day would be his last. He proclaimed that his wife was the devil and that he and his oldest son had to die. Mrs. Bell, out of fear for her son, went to stay with her mother, who lived one block away. She called James Bell, her brother-in-law, to stay with her husband. James described his brother as acting strangely, claiming "people were surrounding him". He also claimed that the devil was around him and approaching his children.

On September 17 John's mother-in-law came to his apartment to get clothes for her grandchildren. Twenty minutes later, at around 7:00 A.M., John Bell attempted suicide by setting himself on fire. According to the records of Jacoby Hospital, the patient tried to kill himself because voices told him to do it.

Plaintiffs' expert witness, Dr. Lawrence I. Kaplan, a diplomate of the American Board of Psychiatry and Neurology, testified that the patient's discharge from the hospital was a departure from proper medical practice. Furthermore, the witness deemed the premature release to be a contributing factor in the suicide attempt, which was part of the same psychotic illness for which Bell had been admitted to the hospital. Dr. Kaplan opined that it was not proper medical practice to release a patient when the need for further hospitalization was indicated by the patient's record. The witness observed that the patient had been physically restrained on September 9 and continued to be delusional. The use of restraints is uncommon and shows the potential for assaultive and self-destructive behavior. Dr. Hermann made no notations concerning the use of physical restraints. On the day that Bell was approved for discharge, the nurse's notes showed the patient had not been stabilized nor had he improved. Based upon this record, Dr. Kaplan testified that the patient's premature discharge was an "avoidable" mistake. In addition to an inappropriate discharge, there were other departures from good medical practice evidenced by the hospital record. Initially, the patient's prior medical history, which documented a prior suicide attempt, should have been obtained.

No effort was made to discover the basis of Bell's medical discharge from military service, nor was inquiry made into the depth of the patient's delusions and hallucinations. There was also a failure to conduct any tests to determine if Bell was homicidal or suicidal.

Dr. Kaplan viewed certain aspects as to the actual release of the patient to be contrary to accepted medical practice. He considered it unsound to give a prescription for medication to a patient who had demonstrated his reluctance to take medication. Moreover, the hospital record was silent with respect to discharge planning. The manner in which the patient was discharged was considered to be improper medical practice even if Mrs. Bell knew that her husband was being released. If she was not so advised, releasing a psychotic patient on his own recognizance was, in Dr. Kaplan's view, "terrible".

In contrast, the defendants' expert, Dr. Robert Goldstein, also a diplomate of the American Board of Psychiatry and Neurology, did not consider Bell's release to be improper as the record did not show Bell to be a suicidal risk at the time of discharge. The voices Bell heard were positive and not indicative of any suicidal intent. According to Dr. Goldstein, once it is observed that a patient presents no danger to himself or others he has a right to be released. While it is better to find out as much about a patient's delusions as one can, oftentimes hospital records only show the patient is delusional without describing the specifics of the delusions. However, Dr. Hermann did note that Bell was having religious delusions indicating that inquiry had been made. Dr. Goldstein did not consider it a deviation from good medical practice not to conduct testing as there was no question concerning the patient's condition. Nor was it improper to release a patient with a prescription for medication if he was co-operative. The expert observed that one can only hope a patient will take his medication, but statistics show that most do not.

As the patient did not attempt suicide until a week after his release, Dr. Goldstein maintained that some independent catalyst is indicated. Defendants' expert believed that Mrs. Bell's leaving home upon her husband's return had a devastating effect on Mr. Bell. In this regard, prior medical

records showed that the patient had a fear of his wife leaving him.

According to defendants' own expert, it was a departure from accepted medical practice for Dr. Hermann and the nurse not to inquire into the auditory hallucinations that Bell was having on September 7 when interviewed by the nurse. Additionally, Dr. Goldstein deemed it improper medical practice not to make inquiry into the delusions the patient was having on September 8 and 9.

The thrust of the defendants' position on appeal is that the decision to release John Bell was a professional medical judgment for which no liability may attach. Bell seeks to sustain the verdict on the ground that the decision to release him was not founded upon a careful examination, therefore placing it outside the ambit of the medical judgment doctrine.

It is a well-established principle of medical jurisprudence that no liability obtains for an erroneous professional medical judgment (*Pike v Honsinger,* 155 NY 201, 210; *DuBois v Decker,* 130 NY 325, 330). This rule of course is applicable to the practice of psychiatry (*Topel v Long Is. Jewish Med. Center,* 55 NY2d 682; *Centeno v City of New York,* 48 AD2d 812, affd 40 NY2d 932; *Cameron v State of New York,* 37 AD2d 46, affd 30 NY2d 596; *St. George v State of New York,* 283 App Div 245, affd 308 NY 681; *Fiederlein v City of New York Health & Hosps. Corp.,* 80 AD2d 821, affd 56 NY2d 573; *Paradies v Benedictine Hosp.,* 77 AD2d 757; *Taig v State of New York,* 19 AD2d 182).

Claims of psychiatric malpractice often involve the soundness of the decision to release a patient who had been confined for treatment (*Cohen v State of New York,* 51 AD2d 494, affd 41 NY2d 1086; *Homere v State of New York,* 48 AD2d 422; *Statini v State of New York,* 202 Misc 689; *Centeno v City of New York, supra; Cameron v State of New York, supra; St. George v State of New York, supra; Fiederlein v City of New York Health & Hosps. Corp., supra; Paradies v Benedictine Hosp., supra; Taig v State of New York, supra*). At issue in such cases is not only the safety of our citizenry and the patient, but the impact that a finding of liability for premature release would have on the potential liberty of mental patients who are hospitalized. With

respect to the latter, the law has sought to conform with psychiatric objectives to "return the patient to society" (*St. George v State of New York,* 283 App Div 245, 248, *supra*) and to "take the patient out of the hospital which is a place of cure as distinguished from a place of confinement, and to move him into a normal environment in aid of his social adjustment" (*Statini v State of New York,* 202 Misc 689, 693, *supra*).

In *St. George v State of New York* (283 App Div, at p 249, *supra*), the court was particularly wary of imposing liability for the claimed wrongful release of a psychiatric patient and declared: "To sustain this judgment would have a more far-reaching effect than the money damages. In its practical aspects it would mean that the State could release no one from any State mental institution without being under the risk of liability for whatever he did thereafter, and the result would necessarily be reluctance to release and the unnecessary confinement of persons who would benefit by release."

Similarly, in this regard it has been stated: "The prediction of the future course of a mental illness is a professional judgment of high responsibility and in some instances it involves a measure of calculated risk. If a liability were imposed on the physician or the State each time the prediction of future course of mental disease was wrong, few releases would ever be made and the hope of recovery and rehabilitation of a vast number of patients would be impeded and frustrated. This is one of the medical and public risks which must be taken on balance, even though it may sometimes result in injury to the patient or others" (*Taig v State of New York,* 19 AD2d 182, 183, *supra;* see, also, *Higgins v State of New York,* 24 AD2d 147).

Nevertheless these significant policy considerations do not in any sense abrogate the psychiatrist's duty to rest his decision to release the patient upon a careful and competent examination (*Pike v Honsinger,* 155 NY 201, 210, *supra; DuBois v Decker,* 130 NY 325, 330, *supra;* see, also, *Fatuck v Hillside Hosp.,* 45 AD2d 708).

A decision that is without proper medical foundation, that is, one which is not the product of a careful examination, is not to be legally insulated as a professional medical

judgment (see *Larkin v State of New York,* 84 AD2d 438, 445-446; *Herold v State of New York,* 15 AD2d 835, 836; *Weatherly v State of New York,* 109 Misc 2d 1024, 1029; *Hirschberg v State of New York,* 91 Misc 2d 590, 595; *O'Neil v State of New York,* 66 Misc 2d 936, 943; *Whitree v State of New York,* 56 Misc 2d 693, 708). Stated otherwise, "[p]hysicians are not liable for mistakes in professional judgment, provided that they do what they think best *after careful examination* * * * However, liability can ensue if their judgment *is not based upon intelligence* and thus there is a failure to exercise any professional judgment" (*Pigno v Bunim,* 43 AD2d 718, affd 35 NY2d 841; emphasis supplied). However, in the application of the rule it has been observed that "the line between medical judgment and deviation from good medical practice is not easy to draw" (*Topel v Long Is. Jewish Med. Center,* 55 NY2d 682, 684, *supra*).

When the claimed malpractice concerns the wrongful release of a patient, courts have refused to impose liability unless there was "something more" than an error of judgment (see *Cohen v State of New York,* 51 AD2d 494, 496, *supra; Homere v State of New York,* 48 AD2d 422, 423, *supra;* see, also, *St. George v State of New York,* 283 App Div 245, 248, *supra*).

In *Cohen v State of New York (supra),* the decedent was known to have suicidal potential. He was placed on a ward with an open door and in a program organized around the concept of a therapeutic community. The issue was whether the "doctors made a careful examination of the decedent and then exercised reasonable medical care in determining that the decedent should not be restricted to the ward" on the date of his death (51 AD2d, at p 496). The court found that the treating physician, a first-year intern, was not a qualified psychiatrist (Mental Hygiene Law, former § 27, subd 4) and that the supervising psychiatrist never made a medical judgment based on the nurse's notes or any kind of personal interview. The record contained no written evidence by either the supervising psychiatrist or any qualified psychiatrist as to suicidal propensities at or about the time of death. It was conceded by the treating physician that the decedent should not have been allowed

off the ward on the day of death in view of the nurse's observations. The court concluded (51 AD2d, at p 497): "On the whole, the record contained questions of fact as to supervision and whether or not any qualified medical judgment as to suicidal propensities and restraint was made in view of his behavior in the last part of his hospitalization. The failure to keep detailed and proper medical notes makes the present situation, under these circumstances, more than an error of medical judgment."

In *Homere v State of New York* (48 AD2d 422, *supra*), the patient had been approved for discharge. Nevertheless, the patient remained in the hospital for some 41 days after his release date. One day he became assaultive, necessitating the use of physical restraint. On the following days he suffered seizures. The court found that "these incidents plainly indicated a marked deterioration in the patient's condition which should have put the appropriate hospital authorities and the releasing doctor on notice that there had been a change for the worse in the patient's condition following the * * * recommendation for discharge. In such circumstances * * * another medical judgment was required to determine the patient's fitness for release" (48 AD2d, at p 424).

It is apparent that liability obtained in *Cohen* and *Homere* not because there was "something more" than an erroneous judgment but, rather, there was something less than a professional medical determination.

In the present case it is abundantly clear from the record that Dr. Hermann's recommendation to release Bell was not a professional medical judgment as it was not founded upon a careful examination.

Dr. Hermann testified that his decision to recommend Bell's release turned on whether the patient presented a risk to himself or others. The psychiatrist acknowledged that Bell's delusions could be harmful and could even portend the possibility of suicide. Therefore, it was required medical procedure to inquire into the patient's delusions and hallucinations. Furthermore, good medical practice required that his inquiries be made a part of the medical record.

Dr. Hermann concededly failed to investigate the nature of the delusions the patient had on September 8 and 9. The physician, with candor, admitted that in the absence of such inquiry it was a departure from accepted medical practice for him to write that the patient was "not a danger to self or others" in his note recommending release. The very predicate for the decision to release Bell was admittedly founded upon insufficient inquiry; the admission is nothing less than an acknowledgment that his determination was devoid of careful examination.

There is more which evidences that Bell's discharge was not founded upon accepted medical practice. Dr. Hermann, in his note of September 9 recommending release, stated that the patient had shown "some improvement". However, that very same day in the early morning hours, Bell became physically resistive and had to be placed in a straightjacket for five hours. There is no evidence that inquiry was made by the psychiatrist into this extraordinary event. Nor is there any evidence that Dr. Hermann was even aware of the need to physically restrain Bell although such information was available to him. The record shows that Dr. Hermann made determinations that were contradicted by the observations of various members of the hospital staff. It is impossible to reconcile the physician's findings that Bell had shown some improvement as of September 9 with the supervising nurse's statement the same day that the patient was worse. Certainly the use of physical restraints does not bespeak of improvement.

Unlike *Centeno v City of New York* (48 AD2d 812, *supra*), a case relied upon by the defendants, there was substantial evidence here that the patient had not improved, as well as a concession by the treating psychiatrist that he failed to make necessary medical inquiries as to the patient's condition.

Nor does this case involve the failure of a treating psychiatrist to consider an isolated observation of a nurse (see *Fiederlein v City of New York Health & Hosps. Corp.*, 80 AD2d 821, *supra*). Instead there appears to be a continuous absence of co-ordination between the treating psychiatrist and the nursing staff (cf. *Cohen v State of New York*, 51 AD2d 494, *supra; Weatherly v State of New York,* 109

Misc 2d 1024, *supra*). In short, the decision to recommend the release of patient John Bell cannot be deemed to have been a professional medical judgment founded upon a careful examination (see *Pike v Honsinger*, 155 NY 201, *supra*).

The defendants urge that no liability should ensue in the absence of evidence that the patient was a suicidal risk. We think this proposition simply begs the question. Certainly suicide is within the realm of foreseeable consequences for a delusional patient even where there is no evidence of such ideations (*Robertson v Towns Hosp.*, 178 App Div 285, 288). Such was indeed conceded by the treating psychiatrist. Therefore, the issue of liability is dependent upon the thoroughness of the inquiry made to determine if the patient is a risk to himself. In this case the probe into the patient's delusions and hallucinations was admittedly insufficient. Nor did Dr. Hermann make any attempt to ascertain from the Veteran's Administration Hospital, the patient's medical history and treatment, even though he noted that Bell "refuse[d] to discuss his past psychiatric history". Suicidal ideations or tendencies may well have gone undetected as a result of inadequate examination.

The defendants, in the alternative, also challenged the causal relationship with respect to the injuries sustained and Bell's release assuming, *arguendo*, that the release constituted negligence (cf. *Paradies v Benedictine Hosp.*, 77 AD2d 757, 759, *supra*). Plaintiffs were entitled to establish proximate or legal cause through the use of expert testimony (see *Matott v Ward*, 48 NY2d 455, 459; *Fuller v Preis*, 35 NY2d 425, 433; *Toth v Community Hosp. at Glen Cove*, 22 NY2d 255, 261; Richardson, Evidence [Prince, 10th ed], § 371). Upon the establishment of a prima facie case the issue of legal causation is appropriate for jury resolution (see *Derdiarian v Felix Contr. Corp.*, 51 NY2d 308, 315; *Dunham v Village of Canisteo*, 303 NY 498, 506; *Kallenberg v Beth Israel Hosp.*, 45 AD2d 177, 180, affd 37 NY2d 719).

In our view, the proof on the question of causation was sufficient to submit the issue to the jury. Plaintiffs' expert testified that the premature discharge of the patient was a contributing factor in the attempted suicide, which was

viewed as being part of a continuing psychotic process. In other words, the attempted suicide was a product of the illness for which John Bell was negligently treated, and his premature release from the hospital. Furthermore, the defendants were clearly in a position to prevent the "avoidable" mistake had proper care been exercised. Bell only had the burden to establish that the premature discharge was a substantial contributing factor of his injuries. He was not obligated to exclude other potential causes. The jury could either reject or accept the physician's opinion that the negligent release of plaintiff John Bell was a proximate cause of the suicide attempt (see *Fuller v Preis,* 35 NY2d 425, 433, *supra*).

The defendants assign error to the trial court's refusal to charge the jury on intervening causation. The basis for the instruction is not clear from the record, but the position taken on appeal is that Mrs. Bell's leaving home constituted an independent intervening act which is without legal relation to the defendants' conduct.

The treating psychiatrist and hospital may not be held liable for an intervening act of a third party which proximately caused the injury and was not a natural or foreseeable consequence of their wrongful conduct (see *Derdiarian v Felix Contr. Corp., supra,* p 315; *Dunn v State of New York,* 29 NY2d 313, 318; *Saugerties Bank v Delaware & Hudson Co.,* 236 NY 425, 430). However, the intervening act must be a new and independent force, for it is well settled that a defendant will not be relieved of liability where the intervening act was set in motion by the defendant's own wrongful acts (*Milwaukee & St. Paul Ry. Co. v Kellogg,* 94 US 469, 476; *Benenson v National Sur. Co.,* 235 App Div 294, 301; *Hoggard v Otis Elevator Co.,* 52 Misc 2d 704, 708, affd 28 AD2d 1207; Prosser, Torts [4th ed], § 44; 65 CJS, Negligence, § 111[5], p 1216). Similarly, there is no break in causation where intervention is invited or induced by the misconduct (*Atchison, Topeka, & Santa Fe Ry. Co. v Calhoun,* 213 US 1, 7). "If the intervening cause is merely incidental, and was set in motion or made effective by the original act, the law may ignore it and fix responsibility upon the initial act in the chain of events" (*Di Sabato v Soffes,* 9 AD2d 297, 305).

The jury made the specific finding that John Bell was negligently released from the hospital. Mrs. Bell's act of leaving was undoubtedly set in motion by her husband's presence and threatening behavior. Mr. Bell still professed that he and his oldest son had to die. And who is to say that her act of leaving may not have saved yet an additional tragedy? In any event, the peril to which Mrs. Bell responded was activated by the defendants' wrongful discharge of her husband. For just as danger invites rescue, it also induces the retreat to safety. Mrs. Bell's conduct was not an intervening act, but part of a continuum of events initiated by the defendants' original misconduct. At best her leaving was a concurrent cause of the attempted suicide for which the defendants would not be relieved of their responsibility (see *Leeds v New York Tel. Co.*, 178 NY 118, 121; *Hawkes v Goll*, 256 App Div 940, affd 281 NY 808; see, also, *Fuller v Preis*, 35 NY2d 425, 433, *supra*). There is no reasonable view of the evidence that would allow for the conclusion that Mrs. Bell's leaving was an intervening act which relieved the defendants of their liability (see *Di Sabato v Soffes*, 9 AD2d 297, 305, *supra*).

Therefore no issue was created which warranted jury resolution and the court properly refused to instruct the jury on intervening causation.

Nor was it error for the court to submit seven interrogatories to the jury in an attempt to isolate the claimed instances of malpractice (see *Kallenberg v Beth Israel Hosp.*, 45 AD2d 177, affd 37 NY2d 719, *supra;* CPLR 4111, subd [c]; see, also, *Darrah v Kite*, 32 AD2d 208, 210). The defendants did not take exception to the use of the interrogatories and the issue was apparently waived (see *Marine Midland Bank v Russo Produce Co.*, 50 NY2d 31, 41). While certain interrogatories may have been overly narrow[*] (see *Lichtenstein v Montefiore Hosp. & Med. Center*, 56 AD2d 281), the fundamental question to be determined by the jury was whether the discharge of plaintiff John Bell

---

[*] The interrogatories were whether John Bell sustained his burden of proof that under the facts of this case each of the following constituted a deviation from accepted medical practice and was a proximate cause of the injuries: (1) discharging him; (2) failing to give detailed instructions for medication and aftercare upon discharge; (3) failing to inquire into causes of delusions and/or hallucinations; (4) giving him a prescription for thorazine; (5) failing to inquire as to his previous commitment at the V.A. Hospital; (6) failing to have specific medical notes on his admitting chart; and (7) failing to perform clinical tests.

was a deviation from accepted medical practice and proximately caused his injuries. This was the first interrogatory submitted to the jury. Furthermore the jury was instructed that there could be no finding of negligence "unless the risk of injury was reasonably foreseeable", and "Doctor Hermann * * * could or should have foreseen the probability of such an act as we have in this case".

Thus we are not prepared to say that the jury failed to properly resolve the primary question relative to liability in accordance with proper legal standards (see *Kallenberg v Beth Israel Hosp.*, 45 AD2d 177, *supra*).

We have reviewed the defendants' other contentions and find them to be without merit. Accordingly, the judgment should be affirmed insofar as appealed from.

MOLLEN, P. J., DAMIANI and BRACKEN, JJ., concur.

Judgment of the Supreme Court, Kings County, entered January 27, 1981, affirmed insofar as appealed from, without costs or disbursements.