■ PATRICIA CLARK, Appellant, v STATE OF NEW YORK, Respondent. (Claim No. 62962.) — Appeal from a judgment of the Court of Claims (Rossetti, J.), entered July 28, 1982, which dismissed the claim. The issue to be resolved on this appeal is whether the State may be held liable for injuries sustained by claimant resulting from an attack with a knife by one John Lynch, then an out-patient at the Capital District Psychiatric Center (CDPC), a State-operated facility. The general rule is that, under such circumstances, the State may not be held liable for errors in medical judgment by psychiatrists in the employ of the State if such judgment, even though erroneous, is exercised after careful examination of the patient (*Cohen v State of New York*, 51 AD2d 494, 496, affd 41 NY2d 1086). Thus, the issue is further distilled to the question of whether the decision to retain John Lynch as an out-patient, rather than hospitalize him prior to the assault upon claimant, was a medical judgment made after "careful examination", for if that decision was not founded upon careful examination, it was not a professional medical judgment and the State could be cast in liability (*Bell v New York City Health & Hosps. Corp.*, 90 AD2d 270). John Lynch has a long history of psychiatric disorder. His first contact with CDPC was in July, 1971, when he was referred by Albany Medical Center Hospital (AMCH) for psychiatric examination after an attempted suicide prompted by auditory hallucinations. He was diagnosed as a paranoid schizophrenic and hospitalized at AMCH until September 1, 1971. Another suicide attempt in February, 1973 resulted in readmission to AMCH for about three weeks with follow-up therapy at CDPC until August, 1974. In September, 1974, he was involved in an altercation with two State troopers during which he broke one of the trooper's legs by stomping on it. He was charged with and tried for assault, but acquitted in July, 1975 by reason of mental disease or defect and committed to the Hudson River Psychiatric Center. He was released from that institution on March 11, 1976. Pursuant to the provisions of former CPL 330.20 (subd 2), his release was conditioned upon his receiving out-patient treatment at CDPC and, should he fail to avail himself of the programmed treatment, CDPC was to notify the court issuing the order. In May, 1976, CDPC staff hospitalized Lynch at AMCH, which in turn transferred him to Saratoga Hospital because of its nearness to his residence. On June 1, 1976, he was discharged to that hospital's halfway house. Thereafter, because of abusive and threatening behavior towards his sister and some neighbors, he was readmitted as an in-patient to CDPC on June 23, 1976, where he received treatment for use of street drugs until his discharge to CDPC's halfway house on July 21, 1976. Shortly thereafter, he moved into an apartment in the building where claimant resided. He was readmitted to AMCH on December 3, 1976, following another attempted suicide, and again discharged to CDPC on January 14, 1977 for continued out-patient treatment. As an out-patient, he continued his employment at the Albany Library for the Blind and attended group therapy sessions as a patient of Dr. Michael Murphy, who had prescribed Haldol as an antipsychotic drug to be taken by Lynch. In February, 1978, Lynch's condition deteriorated to the point where his roommate and a friend from the local Mental Health Association contacted Dr. Murphy and the nurse assisting in the care of Lynch, Vivian Harrell, to advise them of their concern over Lynch's behavior. He was examined by Dr. Murphy on February 21, 1978 and, although found to be actively psychotic, hallucinating and of peculiar appearance, the doctor felt he was not in need of hospitalization and continued

his medication. He was also seen by Dr. Murphy on March 7, 1978. At that time, Dr. Murphy was concerned with Lynch's use of street drugs, since Haldol could not be given with other drugs. Lynch's condition was described as "marginal" and a close watch with weekly evaluation was directed. On March 17, 1978, Vivian Harrell was again advised of Lynch's deteriorating condition by his roommate and a friend and of their concern about his condition and conduct. Lynch missed his group meeting on March 15 and 22, 1978 and, on the evening of March 23, 1978, he inexplicably attacked claimant. In its decision dated July 16, 1982 dismissing the claim, the Court of Claims found that the decision to continue Lynch as an out-patient was a medical judgment for which the State is not liable and that the failure of CDPC to advise the court of Lynch's missed therapy appointments was inconsequential since it is speculative to conclude the court, under the circumstances, would have committed Lynch prior to his assault upon claimant. In our view, however, this record demonstrates that Dr. Murphy's decision not to hospitalize Lynch on March 1, 1978 was not a professional medical determination because it was not founded upon careful examination of the patient, the medical record, and the vital information available from Vivian Harrell at that time. Since it was not based upon such intelligent examination, it cannot be classified as a professional judgment (*Pigno v Bunim*, 43 AD2d 718, affd 35 NY2d 841). Accordingly, liability may be imposed upon the State (*Larkin v State of New York*, 84 AD2d 438). Additionally, this record further demonstrates the presence of "something more" than an error of judgment, sufficient to impose liability under the circumstances presented (see *Cohen v State of New York*, 51 AD2d 494, 496, *supra; Homere v State of New York*, 48 AD2d 422, 423; *St. George v State of New York*, 283 App Div 245, 248, affd 308 NY 681). Here, close personal friends of Lynch contacted CDPC on two separate occasions shortly before the assault on claimant to voice their concern. One of them spoke personally to Dr. Murphy, describing Lynch's unusual behavior, deteriorating condition, and continuing hallucinations. The progress notes of CDPC, dated March 17, 1978, state "[i]t is unclear what is going on". The notes of March 7, 1978 and March 1, 1978, apparently in Dr. Murphy's handwriting, refer to "bizarre behavior", "not taking Haldol", and "continue weekly group and evaluate weekly". This record and the testimony of Dr. Murphy indicate an almost casual consideration of the problems of a deeply troubled patient. It seems to us that at some point the calculated risk imposed upon the public should be counterbalanced by a closer examination of the potential for harm by one with the past history and present complaints of John Lynch. He had been consistently diagnosed as a chronic paranoid schizophrenic. His past history presented episodes of violent assaultive behavior. He was known to be on street drugs which he took together with or in lieu of the prescribed antipsychotic drug Haldol. He had attempted suicide on at least three occasions. In this case, a member of the general public should not be required to accept such a risk (see *Taig v State of New York*, 19 AD2d 182). The State should not be exonerated from liability under these circumstances (see *Bell v New York City Health & Hosps. Corp.*, 90 AD2d 270, *supra*). Judgment reversed, on the law and the facts, with costs, claim reinstated, judgment directed to be entered in favor of claimant on the issue of liability, and matter remitted to the Court of Claims for trial on the issue of damages. Kane, J. P., Mikoll and Weiss, JJ., concur.

Main and Yesawich, Jr., JJ., dissent and vote to affirm in the following memorandum by Yesawich, Jr., J. Yesawich, Jr., J. (dissenting). We would affirm. As the majority notes, the State cannot be held liable for errors in judgment made by qualified physicians while employed by the State provided careful examination has been made of the patient (*Centeno v City of New York*, 48 AD2d 812, affd 40 NY2d 932). Since Dr. Murphy's competency as a

psychiatrist was conceded, the only issue, and that a factual one (see *Cohen v State of New York*, 51 AD2d 494, affd 41 NY2d 1086; *Bell v New York City Health & Hosps. Corp.*, 90 AD2d 270), is whether his decision not to involuntarily hospitalize Lynch was arrived at providently (see *Koenigsmark v State of New York*, 80 AD2d 707, affd 55 NY2d 928). In the 15 months before the attack on claimant, Lynch, an out-patient for all but approximately three weeks, had not been involved in a single assaultive incident. Additionally, from December 1 to December 19, 1977, the period he was an in-patient, he had voluntarily admitted himself to the hospital. During his earlier hospitalization at the Hudson River Psychiatric Center following his encounter with the State Police, the one serious assault he had ever been implicated in, he had also responded favorably and quickly to medication. His medical records make amply clear that the principal risk Lynch presented was not to others but to himself; on several occasions, auditory hallucinations had prompted him to attempt suicide. Dr. Murphy's progress notes of his March 7 examination of Lynch indicate Lynch's condition had improved from the prior week when the doctor had expressed concern that Lynch might require hospitalization. A friend of Lynch's who was at hand at the March 7 examination reported Lynch was "better" and that the latter desired and was able to return to his job, and the doctor remarked that Lynch was acting "more in control than before". In the doctor's judgment, continuation of the group therapy treatments Lynch was already attending, coupled with a weekly evaluation of the patient, was appropriate. In addition, Lynch's nurse-therapist was in contact with him by phone on March 17; that conversation yielded nothing that would cause her to alert the doctor that Lynch was approaching a crisis. In short, the record reflects that Dr. Murphy, the doctor who had been in continuous contact with Lynch for at least seven months before claimant was attacked, decided against Lynch's hospitalization on the basis of continued careful examination. Given the difficulties inherent in predicting the future course of a mental disorder, the fact that hindsight proves this judgment to have been an ill-fated one does not detract from its aptness at the time it was made.