■ RICHARD E. OELSNER, as Administrator of the Estate of CATHERINE OELSNER, Deceased, Appellant, v STATE OF NEW YORK, Respondent. — In a claim, *inter alia,* to recover damages for wrongful death, claimant appeals from a judgment of the Court of Claims (Blinder, J.), dated July 26, 1982, which dismissed his claim against the defendant State of New York. Judgment reversed, on the law and the facts, with costs, claimant is awarded judgment in his favor on the issue of liability, and matter remitted to the Court of Claims for further proceedings consistent herewith. This is a claim, *inter alia,* to

recover damages for wrongful death allegedly caused by the malpractice of a doctor employed by the defendant State of New York at Pilgrim Psychiatric Center. Claimant alleges that the cause of his wife's death on May 9, 1976 was the failure to correctly diagnose and treat salicylate poisoning. The Court of Claims determined that the diagnosis by the attending physician constituted an "honest error" in professional judgment for which the State cannot be held liable. We disagree. Catherine Oelsner, the decedent, was admitted to Pilgrim Psychiatric Center in April, 1976, and was diagnosed as a schizophrenic, paranoid type. On May 8, 1976, Mrs. Oelsner was permitted to visit her family on a day pass. During her visit, the decedent was continually with her husband and children except for a period of approximately one hour in which she was left alone in her family's apartment. Mrs. Oelsner returned to the hospital later that evening. Several hours later, at 3:00 A.M., the decedent was observed getting in and out of bed, and was agitated and delusional. The night medical officer was notified and at 3:15 A.M. he prescribed and administered 100 milligrams of thorazine. As the morning progressed, Mrs. Oelsner remained mildly agitated and confused; she vomited twice, passed two loose stools, and had fluctuating blood pressure readings. At 9:10 A.M., the decedent was examined by a doctor and was transferred via an ambulance to the medical ward of the hospital. The accompanying transfer note indicated that the patient was experiencing labored breathing, was hyperventilating, had brisk reflexes and a rapid pulse. Upon her admission to the medical ward, Mrs. Oelsner's vital signs were "[b]lood pressure 120 over 78, temperature 101.4, pulse 136, and respiration 32". The notations on Mrs. Oelsner's admission's record indicated that she was confused and incoherent. The nurse also noted that she suspected the patient was experiencing a drug reaction. The decedent was examined by the attending physician. The doctor's clinical impression of the patient's condition was acute gastroenteritis and he ruled out an overdose of sedation. The doctor noted that Mrs. Oelsner appeared to be lethargic and he attributed this condition to the thorazine which the patient had been given earlier that morning. The patient's hyperventilation was considered to be a result of nervousness. A urine analysis test was then conducted by the doctor which revealed traces of sugar and large amounts of acetone in the patient's urine. The doctor considered the possibility of acidosis; however, without any further investigation, he determined that the patient's abnormal acetone level was due to fasting. The doctor ordered that the patient be placed on a liquid diet and that routine tests, including a further urine analysis and an electrolytes test be conducted. Since the decedent had been admitted on a Sunday morning, the tests requested by the attending physician would not be conducted until the following day due to emergency weekend staffing of the hospital's laboratory. Had the doctor labeled the tests "stat", the test would have been conducted immediately. At approximately 1:00 o'clock that afternoon, Mrs. Oelsner experienced acute cardiorespiratory failure, and despite emergency measures taken to revive her, she was pronounced dead at 1:15 P.M. The autopsy report indicated that the cause of death was acidosis, as a result of acute salicylate poisoning. Salicylate poisoning refers to the ingestion of an excessive amount of a type of drug (called salicylates), the most common and best known of which is aspirin. It was never determined where Mrs. Oelsner obtained the drug or when she ingested it. At trial, the attending physician testified that in view of the symptoms exhibited by the decedent, there was no reason for him to suspect salicylate poisoning. The doctor acknowledged, however, that hyperventilation, a rapid pulse and heartbeat, nausea, raised temperatures and lethargy were symptomatic of salicylate poisoning. Claimant's expert testified that in his medical opinion, there was a departure from accepted medical standards of practice in the care and treatment provided the

decedent. The departure related, first, to the failure to make a differential diagnosis of the patient's condition; second, the failure to promptly investigate the cause of the patient's problems, and third, the failure to appropriately treat those problems. The expert opined that the attending physician's reliance upon thorazine to explain the patient's lethargy was inconsistent with the symptoms exhibited by the decedent. It was established that an excessive amount of thorazine would produce depressed respiration, sedation and decreased reflexes. The expert also testified that the doctor's assessment of the abnormal acetone level in the decedent's urine was incorrect since a fast of 24 hours would be insufficient to produce such a large amount of acetone and there was no indication in the hospital records to establish that the patient had been fasting for an extended period of time. The expert concluded that had further investigation and tests been conducted, the patient's serious acidotic condition would have been revealed and the resulting respiratory arrest could have been avoided. The courts have consistently held that liability for medical malpractice will not be imposed for an "honest error" in professional judgment rendered after a careful examination of the patient's condition (*St. George v State of New York,* 283 App Div 245, 248, affd 308 NY 681; *Bell v New York City Health & Hosps. Corp.,* 90 AD2d 270; *Cohen v State of New York,* 51 AD2d 494, affd 41 NY2d 1086). "However, liability can ensue if [the physicians'] judgment is not based upon intelligence and thus there is a failure to exercise any professional judgment" (*Pigno v Bunim,* 43 AD2d 718, affd 35 NY2d 841). "Although the State of New York is not an insurer of the safety of patients in its hospitals (*Root* v. *State of New York,* 180 Misc. 205), this does no [*sic*] relieve them of the duty to exercise the requisite care and skill that is consonant with accepted medical procedure" (*O'Neil v State of New York,* 66 Misc 2d 936, 939-940). In reviewing the record herein, we conclude that the trial court's determination is against the credible weight of the evidence (*Kardas v State of New York,* 24 AD2d 789; *Shipman v Words of Power Missionary Enterprises,* 54 AD2d 1052, 1053). The totality of the evidence demonstrates that the attending physician did not conduct a careful examination and investigation of the decedent's condition. First, by the doctor's own admission, the symptoms displayed by Mrs. Oelsner fit a pattern of a myriad of dysfunctions, including salicylate poisoning; however, no immediate steps were taken to clarify and, in this case, correct his initial diagnosis (*O'Neil v State of New York,* 66 Misc 2d 936, 944, *supra*). Second, the high acetone level in the decedent's urine was an indication that the patient was acidotic and that immediate measures were necessary to ascertain and treat the underlying cause of this condition. The attending physician's failure to order the tests "stat", coupled with his unsubstantiated diagnosis that the high acetone content was due to fasting, was an obvious departure from prudent medical standards. Third, the physician's reliance upon thorazine to explain the patient's lethargy was clearly erroneous since an excessive amount of that drug would result in symptoms inconsistent with those exhibited by the decedent. Finally, in reviewing the record, we note that while the expert's lack of knowledge concerning certain characteristics of salicylates was disturbing, it did not render the totality of his testimony incredible. Accordingly, claimant is awarded judgment on the issue of liability, and the matter is remitted to the Court of Claims for a trial and determination with respect to damages. Lazer, J. P., Gibbons, Weinstein and Boyers, JJ., concur.